EL PUEBLO DE PUERTO RICO, apelado, *v.* ROBERTO CONDE PRATTS, acusado y apelante.

*Número:* CR-82-62     *Resuelto:* 26 de abril de 1984

*Juan Reyes Rodríguez,* abogado del apelante; *Miguel Pagán, Procurador General Interino,* y *Lirio Bernal, Procuradora General Auxiliar,* abogados de El Pueblo.

SENTENCIA

Por pluralidad de votos, sin opinión mayoritaria, se revocan las sentencias dictadas.

Así lo pronunció y manda el Tribunal y certifica el señor

Secretario General Interino. El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Rebollo López concurren en el resultado con opinión. El Juez Asociado Señor Dávila concurre en el resultado y se une a la parte IV de la opinión del Juez Asociado Señor Rebollo López. El Juez Asociado Señor Irizzarry Yunqué concurre en el resultado y se une a la opinión del Juez Asociado Señor Rebollo López. El Juez Asociado Señor Negrón García emitió opinión disidente, a la cual se une el Juez Asociado Señor Díaz Cruz.

(*Fdo.*) Heriberto Pérez
*Secretario General Interino*

—O—

Opinión concurrente del Juez Presidente Señor Trías Monge.

Este caso plantea cuestiones fundamentales sobre algunos aspectos de la garantía contra registros e incautaciones irrazonables.

Roberto Conde Pratts fue declarado culpable en juicio por tribunal de derecho de violar los Arts. 6 y 8 de la Ley de Armas, Ley Núm. 17 de 19 de enero de 1951 (25 L.P.R.A. secs. 416 y 418). Se le condenó a cumplir concurrentemente y en probatoria, seis meses de cárcel y tres años de presidio, respectivamente, por la alegada comisión de estos delitos. El apelante sostiene, básicamente, que el arma ocupada fue obtenida en virtud de un registro ilegal, en violación de la Sec. 10, Art. II, de la Constitución del Estado Libre Asociado.

1. *Los hechos*

J. L. Valentín, empleado de una farmacia, se hallaba el 9 de noviembre de 1981, a eso de la 1:30 de la tarde, llevando a cabo el cuadre de la caja registradora del negocio. Declaró que le "inquietó" observar a una persona fuera del establecimiento que le pareció "sospechosa y nerviosa", "mirando para ambos lados". El individuo "era bajito, bastante llenito, zapatos brown, chaqueta sport brown con un sweater y pelo estilo 'curly'". El señor Valentín no vio a esta persona hacer

ningún movimiento extraño o hablar o hacerle señas a nadie. Después de diez a quince minutos la persona "sospechosa" se montó en un auto Fairmont y lo condujo hasta el Centro Comercial El Señorial, cerca de la farmacia, donde se estacionó.

El señor Valentín, junto a un compañero de trabajo, terminó de prepararse para ir a depositar el dinero en el banco, el cual tenía una sucursal en el referido centro. Como Valentín todavía se sentía inquieto, decidió llamar a la Policía para que les acompañara a efectuar el depósito, mas pasó un carro de patrulla y Valentín lo detuvo. Explicó a los dos policías que viajaban en el vehículo, los señores Quiñones y Pérez, que había por allí una persona que le parecía sospechosa. Los policías acompañaron a los empleados al banco. Antes de entrar, Valentín señaló dónde estaba estacionado el automóvil del supuesto sospechoso. El agente Quiñones se dirigió hacia el vehículo, mientras el resto del grupo entró al banco. Efectuado el depósito, Valentín vio al salir del banco al supuesto sospechoso. El agente Pérez le detuvo, le informó que quería hablar con él y pidió que le acompañara. Se dirigieron hacia donde estaba estacionado el Fairmont.

En el entretanto, el agente Quiñones solicitó del centro de mando de la Policía que averiguase la procedencia del automóvil. Mientras esperaba, se encaminó a mirar hacia dentro del vehículo. Notó, tras pegarse a los cristales e inclinarse, que "debajo del asiento del chofer sobresalía algo brilloso que a él le parecía el cañón de un revólver". Según Quiñones, poco después recibió información del centro de mando al efecto de que el vehículo había sido alquilado a la compañía Avis y que la fecha del alquiler estaba vencida.[1]

---

[1] El récord arroja considerables dudas sobre este aspecto del testimonio de Quiñones. En la declaración jurada que prestó el agente el día de los hechos no hizo mención alguna de estas comunicaciones. Aún más grave, el testigo de cargo A. Rivera Arce, Gerente de Seguridad de Avis, declaró en el contrainterrogatorio que no fue sino hasta después de las cinco de la tarde —no pudo especificar la hora exacta— que se le informó que la Policía había detenido uno de los automóviles de Avis y se le pidió que acudiese a la Sala de Investigaciones del tribunal.

A los pocos minutos llegó el agente Pérez con el apelante. Quiñones preguntó al apelante si tenía licencia para portar armas. Acto seguido, al no producirla el apelante, el agente Quiñones le arrestó. La prueba de cargo guardó silencio sobre si se ocupó el arma antes o después del arresto. El propio policía Pérez declaró como testigo de defensa y expresó crípticamente sobre este particular que su compañero Quiñones arrestó al apelante "porque había encontrado un arma en el auto".

## 2. *Las cuestiones planteadas*

Los hechos reseñados exigen, a fin de determinar la legalidad del registro y la incautación, la consideración de tres excepciones al mandato constitucional de que no se efectúen registros, incautaciones o allanamientos sin mandamiento judicial previo: la llamada doctrina del automóvil, la del objeto ilegal a plena vista y la del registro como acto incidental a un arresto válido. Estas doctrinas no se examinarán, como es natural, en toda su vasta amplitud, sino tan sólo en las fases presentadas por los hechos específicos ante nuestra consideración. Aun así, ello requiere unas observaciones generales previas sobre la naturaleza de la garantía encarnada en el Art. II, Sec. 10, de la Constitución del Estado Libre Asociado.

## 3. *Consideraciones generales sobre la garantía contra registros, incautaciones y allanamientos irrazonables*

El Art. II, Sec. 10 de la Constitución del Estado Libre Asociado dispone, en parte:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
>
> .     .     .     .     .     .     .     .
>
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.

La Cuarta Enmienda a la Constitución de los Estados Unidos provee a su vez:

No se violará el derecho del pueblo a la seguridad de sus personas, hogares, documentos y pertenencias, contra registros y allanamientos irrazonables, y no se expedirá ningún mandamiento, sino a virtud de causa probable, apoyado por juramento o promesa, y que describa en detalle el lugar que ha de ser allanado, y las personas o cosas que han de ser detenidas o incautadas.

Es principio trillado que este Tribunal, en su papel de intérprete máximo de la Constitución del Estado Libre Asociado, no puede reducir el ámbito de los derechos humanos, según se hayan definido estos por el Tribunal Supremo de los Estados Unidos, pero que puede ampliarlo. Cuando se trata de precisar el significado de una cláusula de la Constitución de Puerto Rico que tiene su equivalente en la Constitución de los Estados Unidos, las sentencias del Tribunal Supremo de Estados Unidos tienen valor obligatorio tan sólo en cuanto a la definición del ámbito mínimo del derecho envuelto y calidad persuasiva en lo restante. En tal sentido, este Tribunal goza de facultades análogas a las reconocidas a los tribunales estatales de última instancia. *Pueblo* v. *Figueroa*, 77 D.P.R. 188, 195–198 (1954), confirmado en 232 F.2d 615 (1st Cir. 1956); *R.C.A.* v. *Gobierno de la Capital*, 91 D.P.R. 416, 428–429 (1964); *Pueblo* v. *Dolce*, 105 D.P.R. 422, 426–428 (1976); *Cooper* v. *California*, 386 U.S. 58, 62 (1967); *Sibron* v. *New York*, 392 U.S. 40, 60–61 (1968). El Tribunal Supremo de Estados Unidos no es el único guardián de los derechos humanos. Los tribunales estatales y este Tribunal tienen la obligación irrehuible de descargar independientemente su responsabilidad constitucional en este campo.

Ello es así, particularmente, dado que la jurisprudencia del Tribunal Supremo de los Estados Unidos sobre las excepciones citadas a la garantía contra registros e incautaciones irrazonables ha sufrido tantos cambios abruptos que su valor persuasivo ha mermado considerablemente. El Juez

Powell ha afirmado recientemente, *Robbins* v. *California*, 453 U.S. 420, 430 (1981):

[T]he law of search and seizure with respect to automobiles is intolerably confusing. The Court apparently cannot agree even on what it has held previously, let alone on how . . . [instant] cases should be decided. (Opinión concurrente.)

Un reconocido comentarista ha escrito:

[T]he boundaries of [the automobile exception] remain uncertain. The several decisions of the Court on this subject cannot be satisfactorily reconciled, and in recent years the Court has often been unable to muster a majority position on the issue. It is no exaggeration, therefore, to say that these decisions constitute a "labyrinth of judicial uncertainty". 2 W. LaFave, *Search and Seizure: a Treatise on the Fourth Amendment* 509 (1978).

La doctrina sobre el objeto ilegal a plena vista también está plagada de incerteza. W. Lewis y H. Mannle, *Warrantless Searches and the "Plain View" Doctrine: Current Perspective*, 12 Crim. L. Bull. 5 (1976). Igual ocurre con la teoría del registro incidental a un arresto. L. Weinreb, *Generalities of the Fourth Amendment*, 42 U. Chi. L. Rev. 47 (1974); *Pueblo* v. *Lebrón*, 108 D.P.R. 324, 327 (1979); *Pueblo* v. *Dolce*, 105 D.P.R. 422, 431–433 (1976).

En tales circunstancias es aconsejable apartar la glosa jurisprudencial y examinar el texto en su razón de ser. Nos referiremos tan sólo al Art. II, Sec. 10 de la Constitución del Estado Libre Asociado, en cuya interpretación se basa exclusivamente esta sentencia. Este caso no se funda en aspecto alguno de la Cuarta Enmienda. Las referencias, casos y materiales estadounidenses en el curso de esta opinión se efectúan únicamente para fines comparativos.

La garantía contra registros e incautaciones irrazonables obedece históricamente a tres objetivos: amparar la intimidad de las personas y, más allá de ello, su dignidad como seres humanos; proteger sus documentos y otras pertenencias; e interponer la figura de un juez entre el ciudadano y el

agente del orden público para brindar a aquél la seguridad debida sobre la razonabilidad de los procesos de registro, allanamiento e incautación, vía el juicio de un funcionario imparcial. Sobre las circunstancias históricas que llevaron a la aprobación del Art. II, Sec. 10 de la Constitución, véase: *Pueblo* v. *Dolce*, supra, págs. 429–431.

La regla principal derivable de la garantía constitucional es, por tanto, —regla oscurecida a veces en el análisis de este tema— que todo registro o incautación que se lleve a cabo sin previo mandamiento judicial es irrazonable per se, a menos que esté comprendido dentro de ciertas excepciones rigurosamente definidas. Véanse: *Chimel* v. *California*, 395 U.S. 752, 762 (1969); *Katz* v. *United States*, 389 U.S. 347, 357 (1967). Las excepciones han ido naciendo al calor de un mismo principio: circunstancias apremiantes o perentorias pueden justificar un registro sin mandamiento judicial previo. Puede correrse peligro, por ejemplo, de que la prueba desaparezca o que sufra daño el agente del orden público. La regla y sus excepciones albergan un solo propósito: lograr el ansiado equilibrio entre uno de los derechos humanos más esenciales y preciados en una democracia y el derecho de la propia comunidad a protegerse contra el crimen. El carácter pendular de la jurisprudencia en este campo se explica por la rotura del equilibrio en varias situaciones, por el peso desmedido que se le ha asignado a veces a uno u otro de los intereses en juego.

Nos hemos expresado antes sobre los pasos a tomar para el análisis de controversias sobre la aplicabilidad de la garantía en cuestión. Al retrotraernos al tiempo inmediatamente anterior al registro, la primera pregunta que se debe hacer es: ¿le era posible al gobierno obtener la orden correspondiente sin comprometer la eficacia del registro o la seguridad de sus agentes? La cuestión de la razonabilidad del registro se ataca en segundo término, después de establecerse que podía actuarse sin orden judicial. *Pueblo* v. *Lebrón*, ante, pág. 328. Véase: R. Williamson, *The Supreme Court,*

*Warrantless Searches, and Exigent Circumstances*, 31 Okla. L. Rev. 110, 143 (1978).

A la luz de estas observaciones, veamos si el caso presente se gobierna por la regla general o por algunas de las excepciones que se han invocado.

### 4. *La excepción del automóvil*

Esta excepción fue creada por el Tribunal Supremo de Estados Unidos en *Carroll* v. *United States*, 267 U.S. 132 (1925). El tribunal resolvió que no era prudente aplicar la regla general a un automóvil que había sido detenido por la Policía mientras transportaba licor de contrabando "porque el vehículo puede ser movido rápidamente de la localidad". Pág. 156. La existencia de tal circunstancia apremiante —la movilidad del vehículo— constituyó en el foro federal estadounidense la base de la excepción, pero luego comenzó ésta a competir con la teoría de que en un automóvil la expectativa de intimidad es en extremo reducida. M. Gardner, *Searches and Seizures of Automobiles and their Contents: Fourth Amendment Considerations in a Post-Ross World*, 62 Neb. L. Rev. 1, 6 *et seq.* (1983). En *Coolidge* v. *New Hampshire*, 403 U.S. 443, 461-462 (1971), el Tribunal Supremo (opinión de la pluralidad de los jueces) fustigó esta tendencia a reducir o aun eliminar la protección contra los registros irrazonables cuando se trata de un vehículo:

> The word "automobile" is not a talisman in whose presence the Fourth Amendment fades away and disappears. And surely there is nothing in this case to invoke the meaning and purpose of the rule of *Carroll* v. *United States*—no alerted criminal bent on flight, no fleeting opportunity on an open highway after a hazardous chase, no contraband or stolen goods or weapons, no confederates waiting to move the evidence, not even the inconvenience of a special police detail to guard the immobilized automobile. In short, by no possible stretch of the legal imagination can this be made into a case where "it is not practicable to secure a warrant".

En el foro federal, la salud de *Coolidge*, supra, en Estados Unidos es precaria, si es que algo resta de él. Los comen-

taristas generalmente apoyan, sin embargo, el retorno a la doctrina de las circunstancias apremiantes, al menos en el caso de vehículos inmovilizados o cuando exista indicación de que el ocupante quiera ocultar efectos en él. L. Katz, *Automobile Searches and Diminished Expectations in the Warrant Clause*, 19 Am. Crim. L. Rev. 557, 570–572 (1982); J. Grano, *Rethinking the Fourth Amendment Warrant Requirement*, 19 Am. Crim. L. Rev. 603, 613–621, 638 *et seq.* (1982); V. Wilson, *The Warrantless Automobile Search: Exception without Justification*, 32 Hastings L.J. 127, 134 (1980); Comentario, *The Automobile Exception: A Contradiction in Fourth Amendment Principles*, 17 San Diego L. Rev. 933, 940 (1980).

Para el tiempo en que se formuló y adoptó el Art. II, Sec. 10 de la Constitución del Estado Libre Asociado la doctrina en efecto era la de las circunstancias apremiantes. La teoría, prevaleciente tan sólo en algunas jurisdicciones, que le niega protección a un vehículo en todo género de circunstancias por la supuesta ausencia de expectativa de intimidad, es de cuño reciente. Su primera expresión formal ocurre en *Cardwell* v. *Lewis*, 417 U.S. 583, 590–591 (1974), aunque hubo expresiones aisladas pocos años antes; Gardner, *supra,* págs. 9–10 n. 51. No vemos razón por la cual descartar el vital requisito de las circunstancias apremiantes —esencia misma, como hemos visto, de las excepciones a la regla general que los registros e incautaciones tienen que realizarse por mandamiento judicial— y remedar al Tribunal Supremo de Estados Unidos en la invención de la teoría de la intimidad evanescente, tan severamente criticada por atentar contra los propios cimientos de la garantía contra los registros e incautaciones irrazonables.

Nuestro continuado respaldo, en las circunstancias del caso presente, a la doctrina de las circunstancias apremiantes no significa que estamos equiparando un automóvil a un hogar a todos los efectos. Existen diferencias sustanciales entre ambos. Tampoco estamos perturbando el equili-

brio indispensable entre el derecho de todo ciudadano, bueno o malo, a que se le proteja contra registros e incautaciones irrazonables y el derecho de la comunidad a que se le escude contra el crimen. Si hay peligro de que se pueda comprometer la eficacia del registro, que la prueba desaparezca o que quede amenazada la seguridad de alguien, es perentorio proceder al registro. No lo es, sin embargo, cuando, como en el caso de autos, el automóvil está inmovilizado, cerrado; su dueño está bajo arresto, sin acceso a armas o a posibles cómplices; y se cuenta con personal suplementario que pueda vigilar el automóvil o efectuar arreglos para su remoción a algún cuartel o lugar bajo el control de la Policía. El registro inmediato es lo más conveniente, pero si tal es el criterio, aún más conveniente es dejarse de aspavientos y abolir la garantía constitucional.

En Puerto Rico no hemos sancionado nunca el registro sin orden de un vehículo por el simple hecho de que esté dotado de motor y ruedas. Desde el primer caso, *Pueblo* v. *Guzmán*, 34 D.P.R. 117 (1925), en que adoptamos la doctrina de *Carroll*, supra, hasta el presente hemos sancionado el registro cuando han mediado circunstancias apremiantes que lo han aconsejado así. Cuando no han existido tales circunstancias no hemos justificado el registro y hemos ordenado la absolución del acusado. *Pueblo* v. *Decós*, 62 D.P.R. 148 (1943); *Pueblo* v. *Sosa Díaz*, 90 D.P.R. 622 (1964); *Pueblo* v. *De Jesús Franqui*, 96 D.P.R. 643 (1968).

No siempre hemos expuesto en su totalidad la base teórica de nuestra decisión y, a partir de la creación de la doctrina de la intimidad disminuida, a veces nos hemos referido a la diferencia existente entre la expectativa de intimidad en el hogar y en un automóvil. A poco que se examinen los hechos de estos casos, sin embargo, se encuentra que circunstancias apremiantes son las que en el fondo dictan el resultado del caso. En *Pueblo* v. *Vargas Delgado*, 105 D.P.R. 335 (1976), por ejemplo, permitimos la incautación, tras una confidencia, de un vehículo hurtado para su examen cuando no

se pudieron producir los papeles del mismo en el taller de hojalatería en que se encontró y existía peligro de que el auto desapareciese o que se alterase su identidad, ya que se estaba trabajando en él. En *Pueblo* v. *Acevedo Escobar*, 112 D.P.R. 770 (1982), la decisión descansa fundamentalmente sobre otra excepción a la regla general: el acusado consintió al registro. Aun así, debe recordarse que este Tribunal señaló en *Acevedo*, supra, págs. 775-776, citando a *Pueblo* v. *Tribunal Superior*, 91 D.P.R. 19 (1964), que "[e]l ámbito de la prohibición protege a todos, tanto al sospechoso o conocido ofensor, como al inocente y se extiende al lugar objeto del registro". A continuación recalcamos que las excepciones a la regla general se basan en circunstancias apremiantes. "Como todo principio constitucional, el mismo no es absoluto y permite excepciones fundadas en intereses apremiantes." Es dentro de ese contexto que se expresa que el uso por las vías públicas de un automóvil y otras de sus características "diluyen la razonable expectativa de privacidad con referencia a otros tipos de propiedad. Si el registro es razonable o no dependerá de los hechos y circunstancias especiales de cada caso, *'la atmósfera total'*". (Énfasis suplido.) No cambiamos la base de la excepción. Nos referimos tan sólo a condiciones innegables que la distinguen.

*Pueblo* v. *Del Río*, 113 D.P.R. 684, 692 (1982), ilustra nuevamente el papel de las circunstancias agravantes en la aplicación de la excepción del automóvil. En tal caso se estaba buscando, tras una confidencia, a ciertos prófugos. Se observa al apelante mientras portaba un revólver y abordaba un automóvil. La Policía detiene el vehículo en marcha. Se arresta al apelante por portar armas sin licencia y se registra el vehículo para localizar el arma observada antes. Resolvimos con entera razón que el registro era válido. Señalamos al efecto "la necesidad de: (1) ocupar armas de fuego que se pueden encontrar ocultas en [las] área[s] inmediata[s] al sitio en donde se realiza el arresto, las cuales pueden ser utilizadas para agredir a los agentes o para intentar escapar; y (2) ocupar evidencia que pueda ser destruida".

Según hemos visto, en el caso de autos no se dieron las circunstancias apremiantes necesarias para justificar la aplicación de la excepción del automóvil.

5. *La excepción del objeto ilegal a plena vista*

Así como la presencia de un vehículo no hace desaparecer por arte de magia, no importa las circunstancias envueltas, la garantía contra los registros irrazonables, la observación de un objeto ilegal a plena vista no constituye licencia para su incautación en todo, casi sin orden judicial. Como ha escrito C. Moylan, Jr., *The Plain View Doctrine: Unexpected Child of the Great "Search Incident" Geography Battle*, 26 Mercer L. Rev. 1047, 1096 (1975):

> Seeing something in open view does not, of course, dispose, ipso facto, of the problem of crossing constitutionally protected thresholds. Those who thoughtlessly over-apply the plain view doctrine to every situation where there is a visual open view have not yet learned the simple lesson long since mastered by old hands at the burlesque houses, "You can't touch everything you can see".

La doctrina del objeto ilegal a plena vista es aplicable únicamente en ciertas circunstancias específicas. En *Dolce,* supra, pág. 447, expusimos varias condiciones que deben cumplirse para utilizar la doctrina. Al mismo efecto: *Coolidge,* supra; *Texas* v. *Brown,* 460 U.S. 730, 75 L. Ed.2d 502, 510-511 (1983). En el caso actual la doctrina es inaplicable por estar ausentes al menos dos de los requisitos necesarios para su empleo. Para activar la doctrina debe haber una intromisión previa válida. Según se explicó en *Coolidge,* supra, pág. 466:

> What the "plain view" cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused. The doctrine serves to supplement the prior justification —whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other legitimate reason for being

present unconnected with a search directed against the accused— and permits the warrantless seizure.

El arma en el caso de autos no se vio en el curso de ejecutar una orden de registro para la incautación de otro objeto o en el curso de una intrusión sin orden, mas válida por darse las circunstancias apremiantes particulares necesarias. Tampoco se descubrió el arma inadvertidamente, otro requisito indispensable.

Debe distinguirse entre el hecho físico de una observación y las condiciones jurídicas que permitan la aplicación de la doctrina a plena vista. Para poder utilizar la doctrina tienen que mediar, además de la observación, otras circunstancias que permitan aplicar alguna de las excepciones a la regla general. *Coolidge,* supra, pág. 468; 1 LaFave, *op. cit.,* pág. 240 *et seq.* La observación, inadvertida o no, puede justificar el arresto mas, si no median las circunstancias apremiantes que traen a escena alguna de las excepciones, la observación a solas no justifica el registro. Adviértase cómo en *Dolce,* supra, en *Del Río,* supra y otros casos en esta jurisdicción se utiliza la doctrina de la plena vista tan sólo en circunstancias en que opera alguna de las excepciones conocidas a la regla.

6. *La doctrina del registro incidental a un arresto*

En *Pueblo* v. *Sosa Díaz,* supra; *Pueblo* v. *De Jesús Robles,* 92 D.P.R. 345 (1965); *Pueblo* v. *Costoso Caballero,* 100 D.P.R. 147 (1971), y *Pueblo* v. *Dolce,* supra, hemos expuesto las condiciones necesarias para invocar esta excepción. Hemos resuelto que es permisible un registro sin orden de allanamiento, tanto en la persona del arrestado como en el área a su alcance inmediato, para ocupar armas que puedan ser empuñadas y utilizadas por el acusado para agredir a los agentes del orden público o para intentar una fuga o para ocupar evidencia que el arrestado podría destruir. En la situación actual, cerrado el automóvil y bajo vigilancia, bajo custodia también el arrestado, no se corría peligro alguno de

agresión a los agentes con el arma fuera del alcance del apelante o de destrucción de tal prueba. El caso presente se gobierna en consecuencia por la regla general. Era posible obtener la orden judicial correspondiente sin comprometer la eficacia del registro o la seguridad de los agentes policíacos. Debió interponerse en este caso la figura del juez entre el ciudadano y los agentes para brindar mayor garantía de razonabilidad al proceso del registro.

Por las razones expuestas, se revocarían las sentencias dictadas y se absolvería al acusado.

—O—

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López, a la cual se une el Juez Asociado Señor Irizarry Yunqué.

Curiosamente no puedo estar de acuerdo totalmente ni con la ponencia del Señor Juez Presidente ni con la del compañero Juez Asociado Negrón García. No obstante entender, al igual que este último, que *la ocupación* del arma de fuego en controversia fue válida, concurro con el resultado a que llega el Juez Presidente a los efectos de que las sentencias apeladas deben ser revocadas, por cuanto entiendo que la prueba presentada no establece la culpabilidad del apelante más allá de duda razonable. Entiendo que ambas ponencias adolecen de la misma falla: no captan correctamente los hechos verdaderamente relevantes y, en su consecuencia, contienen un enfoque incompleto del derecho aplicable.

El día 9 de noviembre de 1981 el Sr. Jorge L. Valentín, gerente de una farmacia localizada en las inmediaciones del Centro Comercial El Señorial, Río Piedras, Puerto Rico, se encontraba realizando el "cuadre" de la caja registradora con el propósito de hacer el depósito que diariamente realizaba como a eso de la 1:30 P.M. en un banco comercial localizado en el mencionado centro comercial. Pudo observar a una "persona sospechosa y nerviosa" que por espacio de 10 a 15 minutos estuvo caminando de un lado a otro al frente de

la farmacia.(¹) Observó, en adición, que este individuo abordó un automóvil que condujo hasta el frente de una de las entradas del centro comercial —la cual era la que usaba regularmente el señor Valentín para ir al banco—, finalmente estacionó el vehículo y se desmontó del mismo.

Temiendo el señor Valentín que dicho individuo tuviera el propósito de asaltarlo, detuvo un auto de la Policía de Puerto Rico que pasó por el lugar en el cual viajaban los agentes Wilfredo Pérez y Javier Quiñones, les explicó sus observaciones, brindó a los agentes una descripción detallada del individuo y del vehículo, y solicitó que le dieran protección al hacer el depósito bancario.

Los agentes se separaron: el policía Pérez acompañó al señor Valentín a hacer el depósito en el banco mientras que Quiñones se dirigió hacia donde estaba el vehículo en cuestión. Este último procedió a llamar al "centro de mando" donde primeramente le informaron que el auto pertenecía a una compañía que se dedica al alquiler de automóviles *y, posteriormente, que el alquiler del mismo estaba vencido.*(²) En el ínterin, el policía Quiñones se había acercado al auto y al mirar a través del cristal de la puerta del conductor pudo observar lo que, según su experiencia, era el cañón de un revólver.

---

(¹)"P. Don Jorge, quiere usted explicarle al Tribunal qué usted entiende por sospechoso, qué le estuvo a usted, de este caballero?

"R. O sea, es la forma, sabe, de una persona, la forma de estar nerviosa, moviendo las manos, un malestar, se ve como una persona que no está tranquila, un poco agresiva, quizás.

"P. ¿Cómo dijo?

"R. O sea, mirando hacia ambos lados, no quieta, supuestamente no hacia un mismo lado, hacia una misma área, o sea, intranquilo, nervioso." T.E., págs. 27 y 28.

Como podemos notar, la calificación de persona "sospechosa" resulta exagerada.

(²)"Había sido alquilado *por un día* —del 25 al 26 de octubre de 1981— a un individuo de nombre Miguel Ríos Soto, *persona distinta al Apelante* según el testimonio en corte de la testigo de cargo María Laura Pérez." (Énfasis suplido.) T.E., págs. 9 y 10.

Coetáneamente a ello y al salir del banco el policía Pérez y el señor Valentín, este último ve al "sospechoso" —el apelante— en uno de los pasillos del centro comercial y se lo señala al policía Pérez. Éste se le acerca al individuo, *le pregunta si "anda" en un vehículo de motor, contestando que no el apelante*; (³) entonces el agente lo "invita" a que lo "acompañe" hasta donde está su compañero policía. (⁴)

Al llegar al lugar donde se encontraba el policía Quiñones, éste le pregunta al apelante si tenía licencia para portar el arma de fuego que había en el auto. *Este último nuevamente niega tener relación alguna con un automóvil.* Ante dicha contestación, y poseyendo información en contrario del señor Valentín, el policía Quiñones procede a arrestar al apelante informándole de sus derechos. Quiñones registra la persona del apelante, *sin encontrar llave alguna del vehículo en su poder.* Procede, entonces, el agente a "abrir" el carro con un "gancho de ropa" y ocupa el revólver que minutos antes había observado.

Acusado el apelante de los delitos de infracción a los Arts. 6 y 8 de la Ley de Armas de Puerto Rico y convicto que fuera por tribunal de derecho, en apelación le imputa al tribunal de instancia la supuesta comisión de cuatro errores, a saber:

1. Erró el Tribunal Superior al declarar sin lugar la moción de absolución perentoria solicitada por el acusado.

2. Erró el Tribunal Superior al declarar sin lugar la moción de supresión de la evidencia obtenida por la Policía ya que ésta se obtuvo en violación a las normas jurisprudenciales vigentes.

---

(³) "Entonces, me acerco al individuo, le digo, le pregunto, [¿] *tu andas en un vehículo? Me dice que no*; le digo acompáñame al vehículo que este muchacho me dice que tu andas *sospechosamente* por ahí, *y me dice que sí.*" (Énfasis suplido.) T.E., págs. 78 y 79.

(⁴) El policía Pérez declaró como testigo de *defensa.* Declaró, como hemos visto, que el apelante *accedió voluntariamente* a acompañarlo, constituyendo su declaración al respecto la única prueba sobre ese punto. Ello nos impide considerar si la "invitación" para que lo "acompañara" fue en efecto un arresto.

3. Erró el Tribunal Superior en su apreciación de la prueba desfilada, habida cuenta de que ésta no establece la culpabilidad del acusado más allá de toda duda razonable y fundada.

4. Erró el Tribunal Superior al determinar que el arresto llevado a cabo por los policías fue uno basado en motivos fundados para arrestar.

I

Podríamos decir que las dos ponencias emitidas "se limitan" a la discusión sobre el punto de si *la ocupación del arma* fue o no en contravención con los derechos garantizados por la Sec. 10 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico y la Enmienda Cuarta de la Constitución de Estados Unidos de América.

Evaden el enfrentarse frontalmente a una interrogante presente en el recurso que nos ocupa[5] y cuya consideración y análisis, dada la jurisprudencia vigente reciente y los hechos específicos del presente caso, consideramos tienen prioridad sobre el punto de la legalidad o no del "registro" en controversia; esto es, si el apelante tiene "capacidad" (*standing*) para solicitar la supresión de la evidencia ocupada.

Debemos recordar que la testigo de cargo María L. Pérez declaró durante el proceso celebrado que el apelante *no* fue la persona que alquiló el automóvil en controversia de la compañía dueña del mismo para la cual ella trabaja; que el apelante le negó tanto al policía Pérez, en el pasillo del centro comercial, como posteriormente al policía Quiñones que él tuviera relación alguna con el vehículo objeto del "registro"; que el policía Quiñones, al registrar al apelante, no encontró llave ni documento alguno relativo al vehículo en poder de este último; y que el vehículo objeto del "registro" era de alquiler, el cual estaba vencido desde hacía dos semanas.

---

[5] La ponencia del señor Juez Presidente evade totalmente el punto; la del señor Juez Negrón García lo discute parcialmente.

Bajo estos hechos y a la luz de la jurisprudencia —federal y local— aplicable, ¿puede sostenerse que el apelante tenía una *legítima expectativa de privacidad* en el referido vehículo como para poder reclamar protección al amparo de las citadas disposiciones constitucionales y, en su consecuencia, tener "capacidad" (*standing*) para solicitar la supresión de la evidencia ocupada en el vehículo?

En *estricto acatamiento* de la norma jurisprudencial "reciente" tanto en el foro federal como en el local, entendemos que no. Véanse: *Katz* v. *United States*, 389 U.S. 347 (1967); *Rakas* v. *Illinois*, 439 U.S. 128, 132 (1978); *United States* v. *Salvucci*, 448 U.S. 83 (1980); *Rawlings* v. *Kentucky*, 448 U.S. 98 (1980); *United States* v. *Ross*, 456 U.S. 798 (1982); *Texas* v. *Brown*, 75 L. Ed.2d 502 (1983); y *Pueblo* v. *Vargas Delgado*, 105 D.P.R. 335 (1976); *Pueblo* v. *Lebrón*, 108 D.P.R. 324 (1979).

## II

Lo anteriormente expresado, de ordinario constituiría suficiente fundamento para evitar que se tenga que entrar en la discusión y análisis sobre si el "registro" en controversia efectivamente fue o no uno en violación de las citadas disposiciones constitucionales.

Sin embargo, y como bien expresa el Señor Juez Presidente en su ponencia, en relación con casos bajo la Cuarta Enmienda, las decisiones "del Tribunal Supremo de Estados Unidos tienen valor obligatorio tan sólo en cuanto a la definición del *ámbito mínimo* del derecho envuelto y *calidad persuasiva* en lo *restante*". (Énfasis suplido.) Ello significa que este Tribunal, como correctamente expresa el compañero Juez Negrón García en su ponencia, "puede reconocerle a nuestros ciudadanos más derechos".

Personalmente no estamos enteramente de acuerdo con la restrictiva norma jurisprudencial federal vigente relativa a "capacidad" (*standing*), norma que desde hace algún tiempo este Tribunal *aparentemente* ha adoptado en su tota-

lidad. Somos del criterio que si un ciudadano es acusado de la supuesta comisión de un delito público y la evidencia que se pretende utilizar para probar su culpabilidad fue el producto de un registro, a esa persona no se le debe negar la "capacidad" para cuestionar la legalidad de dicho registro. En otras palabras, si el Estado pretende *relacionar* a un acusado con determinado material delictivo y así privarlo de su libertad con motivo de ello, dicho ciudadano debe tener el *derecho automático* de cuestionar la legalidad de la forma o manera en que el Estado advino en posesión del material delictivo.

En el presente caso tenemos que un agente del orden público "abre" un automóvil estacionado en la vía pública y ocupa dentro del mismo un arma de fuego. Para relacionar al apelante con dicho revólver, el Estado presenta el testimonio de un ciudadano particular que declara que vio al apelante conducir dicho vehículo de motor en determinado momento. El apelante es acusado y convicto de un delito grave, y de uno menos grave, en relación *precisamente* con la supuesta posesión y portación del arma de fuego ocupada.

Negarle al apelante bajo esas circunstancias, por meros tecnicismos, el derecho de cuestionar la legalidad de la forma y manera en que los agentes del Estado ocuparon el arma de fuego constituiría, a nuestra manera de ver las cosas, una palpable injusticia. Debido a ello es que pasamos a considerar el punto de "la legalidad" del "registro" efectuado.

## III

Un agente de la Policía de Puerto Rico, al igual que todos los ciudadanos que convivimos en esta isla, tiene el derecho absoluto de utilizar nuestras vías públicas. No puede ser cuestionado, en su consecuencia, el derecho del policía Quiñones a estar en el sitio específico —al lado del vehículo— desde donde miró hacia el interior del mismo.

Igualmente incontrovertible es el hecho de que no hay

nada de ilegal en el acto de un agente del orden público, o de cualquier otro ciudadano, de mirar desde la vía pública hacia el interior de un vehículo de motor que se encuentra estacionado en la misma.

Independientemente de que el revólver ocupado estuviera "a plena vista", como lo llama el Señor Juez Presidente, o "a vista abierta", en palabras del Señor Juez Negrón García, el hecho cierto e innegable es que el revólver podía ser visto desde el exterior del vehículo en cuestión. (6) Entendemos que un material delictivo que está expuesto a la vista de todo el mundo en un sitio público no está protegido por las citadas disposiciones constitucionales. Véase: *Katz* v. *United States*, 389 U.S. 347 (1967). Bajo los *hechos específicos* del presente caso, (7) la ocupación del revólver no constituyó un registro y sí *una confiscación o incautación de material prima facie delictivo*. (8) En su consecuencia, entendemos que el policía Quiñones tenía la facultad para *incautarse u ocupar* el revólver que estaba en el interior del vehículo sin necesidad de mandamiento judicial previo a esos efectos. Aun cuando en relación con esta clase de casos —de "registros y allanamientos"— los tribunales tienen la obligación de establecer normas generales que regulen la materia, debemos recordar que, por lo general, se hace necesario resolver cada caso de acuerdo con sus hechos particulares.

Argumentar, como lo hace el Señor Juez Presidente en su ponencia, que para que "se active" la doctrina del objeto ilegal a plena vista, tiene que *por necesidad* haber una "intrusión" previa válida del agente del orden público —o

---

(6) Prueba a la que dio entero crédito el tribunal de instancia y que el apelante no cuestiona.

(7) Un arma de fuego que puede ser observada a plena vista dentro de un automóvil de alquiler estacionado en una vía pública, el alquiler de cuyo automóvil está vencido.

(8) En *Pueblo* v. *Del Río*, 113 D.P.R. 684, 689 (1982), resolvimos que "la posesión y/o portación de un arma de fuego *no* es un derecho y sí un privilegio; en otras palabras es una 'actividad' controlada o restringida por el Estado".

sea, que desde un lugar público el agente gane acceso legalmente a uno privado— constituye, dicho ello con el mayor respeto, una interpretación restrictiva y errónea de la referida doctrina y la imposición a la misma de un requisito que resulta absurdo.

Concurrimos, por último, con el Señor Juez Negrón García en su interpretación del requisito de "inadvertencia" a la luz de los hechos específicos del presente caso. En el contexto en que se ha elaborado la citada "doctrina del objeto ilegal a plena vista", a pesar de que el acto del policía Quiñones al mirar hacia el interior del vehículo fue uno "intencional", la observación que hizo del arma de fuego en sí fue "inadvertida" por cuanto no tenía conocimiento previo alguno de que en el interior del vehículo había un arma de fuego.

## IV

¿Derrota la prueba presentada la presunción de inocencia que acompaña a todo acusado de delito público en Puerto Rico mientras su culpabilidad no sea establecida más allá de duda razonable?

Recordemos que la empleada de la compañía Avis Rent A Car declaró que el apelante *no* fue la persona a quien ella le alquiló el 25 de octubre de 1981 el vehículo en controversia. Que el apelante negó, sin vacilación alguna, que "andara" en un vehículo de motor el día de los hechos al ser preguntado al respecto por el policía Pérez en el pasillo del centro comercial. Que el apelante accedió voluntariamente a acompañar al policía Pérez al ser así requerido por éste. Que el apelante negó tener relación alguna con el vehículo de motor en controversia al preguntarle el policía Quiñones si tenía licencia de portar armas en relación con el revólver que había sido observado en el interior del vehículo. Que al ser arrestado y registrado el apelante por el policía Quiñones, éste no encontró documento ni llave alguna en poder de aquél que tuviera relación con el vehículo de motor en controversia.

El hecho de que no se encontrara llave del vehículo en poder del apelante, a nuestra manera de ver las cosas, es sumamente revelador. El apelante no sabía que lo iban a señalar, arrestar y registrar. Por lo tanto, no había razón alguna para que se hubiera desprendido de la llave del carro. Por otro lado, una vez es "invitado" a acompañar al policía Pérez, el apelante está todo el tiempo bajo la supervisión de éste, por lo que no pudo haber "desechado" la misma. Tampoco podemos presumir que se la había dado a otra persona pues, según el testimonio del testigo Valentín, el "sospechoso" estaba solo. Por último, no existe prueba de que el carro estuviera "directo". ¿Cómo es posible, entonces, que el apelante hubiera estado conduciendo el mismo minutos antes de ser detenido?[9]

Frente a toda esa prueba exculpatoria, la única prueba que en alguna forma conecta al apelante *con el revólver ocupado* lo es la declaración del testigo de cargo Valentín a los efectos de que vio al apelante *conducir el vehículo*.

Tenemos duda. Nosotros los jueces también tenemos derecho a dormir tranquilos. Revocaría, en su consecuencia, las sentencias apeladas.

—O—

Opinión disidente del Juez Asociado Señor Negrón García a la cual se une el Juez Asociado Señor Díaz Cruz.

". . . Las garantías personales frente al arresto, el registro, la incautación y el allanamiento, *tienen su límite en la conducta criminal*. Sólo para casos de sospecha fundada o sea cuando medie causa probable —*fuera de actuaciones de delito in fraganti determinadas en la ley penal*— se concede a la autoridad judicial la facultad de expedir mandamientos

---

[9] Igualmente revelador lo es el hecho siguiente: del testimonio del señor Valentín se puede inferir que la "persona sospechosa" que él había observado, aparentemente, tenía la intención de asaltarlo en algún momento en el trayecto hacia el banco. Cabe preguntarnos: si el apelante era esa persona y tenía esas intenciones, ¿cómo es posible que dejara el arma de fuego en el carro?

de arresto y registro." (Énfasis nuestro.) 4 Diario de Sesiones de la Convención Constituyente 2567–2568 (1952).

Este principio, plasmado en la Sec. 10, Art. II de nuestra Carta de Derechos(¹) establece la regla general de que, salvo ciertas excepciones, todo registro, allanamiento y arresto precisa de una orden judicial previa. El apelante Roberto Conde Pratts invoca esa regla general para cuestionar las convicciones impuestas por el Tribunal de Derecho por infringir los Arts. 6 y 8 de la Ley de Armas.(²) Sostiene que el arma fue ocupada en virtud de un registro ilegal, pues era menester tal orden.

El planteamiento requiere primero una breve referencia a los hechos probados y subsiguientemente a un examen, aunque no exhaustivo, de principios jurídicos desarrollados en los últimos años en esta zona vital del derecho constitucional-penal.

## I

La evaluación integral de la prueba,(³) según creída por el tribunal de instancia, revela que la intervención legítima de los policías se debió a la comunicación que hiciera el señor Valentín Díaz —gerente de la Farmacia El Señorial— sobre la conducta rara que apreció, y la aprehensión justificada que experimentó, en torno a las acciones del apelante Conde Pratts. Así, el 9 de noviembre de 1981, como a la 1:30

---

(¹) En lo pertinente reza:

"No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.

.  .  .  .  .  .  .  .  .

"Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse."

(²) Sentenciado a seis (6) meses de cárcel y a tres (3) años de presidio, respectivamente, de manera consecutiva.

(³) El Ministerio Público presentó a los testigos María Luisa Pérez, Adrián Rivera Arce, Jorge Luis Valentín Díaz y al policía Javier Quiñones. El acusado sólo al agente Wilfredo Pérez.

P.M., mientras cuadraba una caja registradora para hacer el depósito bancario diario, notó a Conde Pratts frente al establecimiento, aparentemente nervioso y bien intranquilo, frotándose las manos y mirando para todos lados. Durante todo ese tiempo, aproximadamente quince (15) minutos, dentro de la farmacia estaban los suplidores de unos cigarrillos realizando un inventario. Luego se percató cuando Conde Pratts se montó en un vehículo Fairmont, color crema, que condujo hacia el área de estacionamiento y después alineó cerca de la entrada del Centro Comercial El Señorial. Una vez allí, vio cuando se bajó del vehículo y se situó en la entrada principal del centro comercial. Valentín Díaz, fue en su vehículo y se dirigió para ver y anotar la tablilla del Ford Fairmont, y vio cuando Conde Pratts también montó el Ford Fairmont y se cruzaron entre sí. Después ambos regresaron a sus respectivos puntos de origen. Ese comportamiento lo movió a solicitar posteriormente custodia policial al tener que ir con su compañero Jorge Collazo a depositar una suma considerable de dinero al banco ubicado dentro de la estructura principal del centro comercial.

A esos efectos, Valentín Díaz detuvo y requirió asistencia de un auto patrulla que por allí discurría. Los agentes de la Policía Javier Quiñones y Wilfredo Pérez, del programa de patrullaje preventivo, accedieron. Todos se dirigieron hacia el centro. Durante la corta travesía, Valentín Díaz describió físicamente a Conde Pratts, y además señaló a los agentes el automóvil Fairmont. El policía Quiñones se quedó observando el vehículo. Los otros penetraron al interior del centro comercial. Coetáneamente Quiñones procedió a hacer gestiones encaminadas a conocer quién era el propietario del auto. El centro de mando de la Policía le informó que pertenecía a Avis Rent A Car. Pidió entonces que investigaran con dicha compañía sobre la situación del aludido automóvil. Mientras esperaba, procedió a chequearlo detenidamente, mirando hacia sus interiores. Fue motivado por el conocimiento de que se trataba de un vehículo alquilado conducido

por la persona considerada sospechosa por Valentín Díaz. Al acercarse, inclinarse y pegarse sobre el cristal izquierdo delantero, observó algo brilloso que sobresalía debajo del asiento del chofer. Le pareció que era el cañón de un revólver. Recibió para entonces la información de que el alquiler del vehículo estaba vencido. Por tal razón, cuando llegó el agente Pérez, las demás personas y Conde Pratts, inquirió de éste si tenía licencia de portar armas. Ante la respuesta en la negativa, de que no tenía documento y "andaba a pie" procedió a leerle las advertencias y lo arrestó. Subsiguientemente, el policía Quiñones, en presencia de Conde Pratts abrió el vehículo utilizando un alambre ya que éste no tenía la llave. El arma fue ocupada y el auto sujeto a un trámite de confiscación.[4] La investigación posterior demostró que el arma estuvo envuelta en un escalamiento en Bayamón.

Con este trasfondo de hechos, bajo las variadas teorías de excepción, "firmemente establecidas para medir la razonabilidad del registro de un automóvil"[5] procede confirmar las sentencias.

## II

La Sec. 10 del Art. II de nuestra Constitución se funda en la Cuarta Enmienda de la Constitución de Estados Unidos. Al adoptarse en 1952, la Convención Constituyente incorporó el contenido de la cláusula federal según había sido interpretada por el Tribunal Supremo de Estados Unidos. Así, en ciertos extremos continuamos ligados al valor decisorio de las interpretaciones judiciales del Tribunal Supremo fede-

[4] De esta prueba se desprende que el policía Quiñones cuando inicialmente examina el vehículo estaba dentro del ámbito de una investigación legítima, en un lugar público. Ese examen pudiéramos catalogarlo como rutinario. En ese momento carecía, según admitió en el contrainterrogatorio, de motivos fundados para creer que el auto se había usado para cometer algún delito. Tampoco tenía querella de que fuese hurtado. (E.N.P., pág. 4.) El hallazgo del arma es la circunstancia que le suministra motivos fundados para el arresto e incautamiento válidos.

[5] *Pueblo* v. *Dolce*, 105 D.P.R. 422, 437 esc. 3 (1976).

ral. Véase *Srio. de Hacienda* v. *Tribunal Superior*, 81 D.P.R. 666, 675 (1960). Sin embargo, ese vínculo, como mínimo, nos obliga. Podemos explorar otros horizontes y reconocerle a nuestros ciudadanos más derechos. *Pueblo* v. *Lebrón*, 108 D.P.R. 324 (1979). Ello no significa descartar toda interpretación. Cuando el más alto foro federal interpreta una cláusula constitucional, cuyo texto no ha sido alterado con posterioridad a la fecha en que el equivalente nuestro fue adoptado, ello es guía persuasiva. Su incorporación a nuestro acervo dependerá de su fuerza intrínseca y de que no ofenda nuestro sentido de percepción de cuán extensos pueden y deben ser los derechos fundamentales de los ciudadanos en una comunidad comprometida con la libertad y el sistema democrático. "Todo texto debe interpretarse a la luz de las realidades específicas de la sociedad en que opera . . . [y] que mejor cumple las necesidades del Puerto Rico de hoy. . . ." *Pueblo* v. *Batista Montañez*, 113 D.P.R. 307, 313 (1982).

Tanto en nuestra jurisdicción como en la federal, el desarrollo del área del derecho referente a registros y allanamientos de automóviles, por su complejidad, ha sido lento, tortuoso y a veces errático. No ha estado exento de críticas justificadas. Se ha señalado que la falta de claridad de las normas ha impedido a la Policía descargar eficientemente sus labores. Las dificultades son de distintos géneros.(6)

---

(6) Alguna confusión surge de la libertad con que se usan los términos. Acertadamente, un estudioso ha indicado que se entiende mejor la razón de decidir de los casos a base de establecer una dicotomía entre las frases *a vista abierta* (*open view*) y *plena vista* (*plain view*). "[A] *vista abierta* envuelve esas situaciones en que los agentes de la Policía, para ocupar evidencia, no realizan una intrusión en una zona constitucionalmente protegida. A *plena vista* versa sobre situaciones en que los agentes de la Policía efectúan una intrusión previa justificada a una zona constitucionalmente protegida y mientras allí, ocupan evidencia aparente y disponible sin específicamente 'buscarla'." *Developments in the Law of Warrantless Auto Searches*, 16 Willamette L. Rev. 677, 680 (1980).

Aun para los protagonistas del sistema de justicia penal —personas versadas en derecho— resulta a veces difícil captar correctamente los principios en juego, arribar a conclusiones razonables en torno a la evaluación de determinados hechos o coincidir en sus resultados. Esa dificultad tiene una explicación sencilla. Se trata

# III

No obstante ese vaivén jurisprudencial, existen dos dimensiones doctrinales pertinentes al desenlace del caso: *expectativa razonable de intimidad* y la del *objeto ilegal a plena vista.*

La primera —expectativa razonable de intimidad— fue expresamente incorporada a nuestra jurisdicción en *Pueblo* v. *Bogard,* 100 D.P.R. 565, 571-576 (1972) y reiterada en *Pueblo* v. *Lebrón, supra,* pág. 331. En éste dijimos: *"Katz* v. *United States,* 389 U.S. 347 (1967), cambió la dirección de este enfoque. *Katz* recalcó que la garantía constitucional protege fundamentalmente a las personas. Son ellas sus beneficiarios primarios y no lugares específicos. *La cuestión central es si la persona tiene un derecho razonable a abrigar, donde sea, dentro de las circunstancias del caso específico, la expectativa de que su intimidad se respete.* Para el análisis de *Katz,* v[éa]nse: Nota, *Katz and the Fourth Amendment: A Reasonable Expectation of Privacy or, A Man's Home i[s] His Fort,* 23 Clev. St. L. Rev. 63 (1974); Nota, *A Reconsideration of the Katz Expectation of Privacy Test,* 76 Mich. L. Rev. 154 (1977); Nota, *Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments,* 90 Harv. L. Rev. 945 (1977). *Katz* representa más un refinamiento que una sustitución de la antigua doctrina, *así como un recordatorio de los valores centrales que interesa proteger la garantía contra los registros y allanamientos irrazonables: la intimidad del ser humano y su dignidad innata.* En este sentido el reconocimiento expreso en la Constitución del Estado Libre Asociado de estos dos valores, Art. II, Secs. 1 y 8, amplía sensiblemente el radio

---

de situaciones cambiantes sobre conducta humana disímiles en que se debaten intereses antagónicos. De un lado otorgar la protección más liberal de los derechos individuales "con arreglo a las limitaciones inherentes a la vida en común", y del otro "tener la ecuanimidad que permite conjugar los derechos individuales que desmesurados podrían resultar conflictivos entre sí y los derechos de la comunidad . . .". 4 Diario de Sesiones de la Convención Constituyente 2576 (1952).

del equivalente de la Enmienda Cuarta de nuestra Constitución." (Énfasis suplido.)

Posteriormente reafirmamos su vigencia en *Pueblo* v. *Luzón*, 113 D.P.R. 315 (1982).[7] El análisis sobre la expectativa razonable de intimidad, como medio para evaluar racionalmente la dinámica humana, razonabilidad de la intrusión policiaca y los límites de un reclamo de violación a ese preciado derecho es compatible con nuestra Carta Fundamental y aceptable bajo la misma. "La inviolabilidad de la persona se extiende a todo lo que es necesario para el desarrollo y expresión de la misma. El hogar, los muebles y utensilios, los libros y papeles poseídos por un ciudadano son como una prolongación de su persona, *pues constituyen el ámbito en que se ha hecho y se mantiene.* Toda intromisión sin su permiso en ese círculo privado equivale para todo hombre

---

[7] La norma de *Katz* ha sido considerada como una medida correcta para examinar si la protección constitucional se extiende a determinada práctica policiaca. 1 W. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment* Sec. 2.1, págs. 231–234 (1978); A. Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn. L. Rev. 349, 388 (1974).

En su opinión concurrente el Juez Harlam esbozó que el examen requería dos vertientes. "Primero, que la persona haya exteriorizado una concreta (subjetiva) expectativa de intimidad, y segundo, que la sociedad esté dispuesta a reconocer dicha expectativa como razonable." *Katz* v. *United States*, 389 U.S. 347, 361 (1967). Este enfoque fue seguido por el máximo foro federal en *Smith* v. *Maryland*, 442 U.S. 735 (1979).

Se han destacado los siguientes aspectos vitales expuestos en *Rakas* v. *Illinois*, 439 U.S. 128 (1978), y *Rawlings* v. *Kentucky*, 448 U.S. 98 (1980), para detectar si un acusado tiene en el lugar registrado una expectativa de privacidad:

(1) Si la persona que reclama la protección tenía el derecho de excluir a las demás personas del lugar registrado. *Rakas* v. *Illinois*, supra, pág. 135.

(2) Si el lugar registrado es uno donde una persona prudente y razonable puede esperar que esté exenta de intrusión gubernamental. *Rawlings* v. *Kentucky*, supra, pág. 104.

(3) Si la persona, aunque no esté en posesión o control del lugar registrado, tiene acceso legítimo a dicho lugar. *Rakas*, supra, págs. 135–145.

(4) Si ha tomado algunas medidas o precauciones para mantener su privacidad en el lugar registrado. *Rakas*, supra, págs. 146–148.

(5) Si razonablemente espera tener privacidad en ese lugar. *Rakas*, supra, pág. 149.

Ninguno de los anteriores criterios de por sí garantizan que una persona tenga en un lugar registrado una expectativa de privacidad. Son factores de importancia a evaluarse en la totalidad de circunstancias de cada caso.

a una violación de su personalidad. *Lo mismo acontece en los medios en que se expresa su intimidad y que reserva tan sólo para algunos*: su correspondencia, sus manifestaciones espontáneas a través de los modernos medios mecánicos de comunicación. La lesión de la intimidad es en este sentido el más penoso ataque a los derechos fundamentales de la persona." Diario de Sesiones, *supra*, pág. 2567.

## IV

La doctrina aplica al uso del automóvil. En *Pueblo* v. *Turner Goodman*, 110 D.P.R. 734, 738 (1981), nos pronunciamos sobre la diferencia constitucional entre automóviles y hogares, fundados en que "[e]l derecho a la intimidad cobra mayor importancia cuando el Estado interviene en los hogares de los ciudadanos". Y en *Pueblo* v. *Acevedo Escobar*, 112 D.P.R. 770, 776 (1982), reiteramos que la protección constitucional contra registros irrazonables del Art. II, Sec. 10 se extiende a vehículos de motor bajo el fundamento de una restricción meritoria contra la conducta oficial irrazonable en protección del ciudadano particular. No obstante reconocimos "la diferencia conceptual y funcional entre una residencia o estructura (uso y ubicación *fijos*) y la movilidad y reglamentación de un vehículo de motor, al igual que la fluidez, rapidez y, en ocasiones, situaciones marginales en que ocurren los acontecimientos . . .". También aludimos a que el "uso por las vías públicas de un automóvil, la facultad en ley de detener para fines de infracción de las leyes de tránsito y características del medio de locomoción, diluyen *la razonable expectativa de privacidad* con referencia a otros tipos de propiedad. *Si el registro es razonable o no dependerá de los hechos y circunstancias especiales de cada caso, 'la atmósfera total'*." (Énfasis nuestro.)

En este contexto, el exterior de un vehículo de motor, al igual que aquellas áreas de su interior a vista abierta, esto es, susceptibles de ser apreciadas desde diversos ángulos, directamente o a través de la transparencia de sus cristales,

no forman parte del ámbito aceptable de la expectativa de intimidad. Véase *Texas* v. *Brown*, 103 S.Ct. 1535, 1541 (1983). El destino de un vehículo de motor es la vía pública.[8] Su escrutinio público está contemplado en la Ley de Tránsito que prohíbe que se obstruya la visibilidad y transparencia del parabrisas delantero, o los laterales o trasero, y además reglamenta el uso de cristales unidireccionales y el uso mesurado de tintes. 9 L.P.R.A. secs. 1133 y 1134. Quien en el interior de un vehículo estacionado en área pública expone a la vista de la Policía o extraños un arma —o parte sustancial identificable de la misma— no refleja al amparo de nuestra Constitución, intención, reserva o resguardo del público, como tampoco expresa apropiadamente un reclamo de intimidad. No es razonable que así sea. Se arriesga a la intervención de la Policía fundada en la presunción de ilegalidad de un arma presente en un vehículo, según el Art. 14 de la Ley de Armas, 25 L.P.R.A. sec. 424. Véase *Pueblo* v. *De Jesús Cordero*, 101 D.P.R. 492, 501–502 (1973). L. Katz, *Automobile Searches and Diminished Expectations in the Warrant Clause*, 19 Am. Crim. L. Rev. 557 (1982).

Así, en cuanto a la alegada intromisión de la intimidad, resolvemos que Conde Pratts carecía de tal expectativa. No se ha cuestionado que desde la posición en que el agente Quiñones se situó legalmente, sin mucho esfuerzo, veía parte del arma. Dicho funcionario no venía obligado a cerrar los ojos para dejar de ver lo que desde allí era visible. *Pueblo* v. *Bogard*, supra, pág. 572. La máxima jerarquía constitucional del derecho a la intimidad no se funda en premisas absolutas o absurdas. *P.R. Tel. Co.* v. *Martínez*, 114 D.P.R. 328 (1983). Tampoco quiere decir que "vence a todo otro valor en conflicto bajo todo supuesto concebible". *E.L.A.* v. *P.R. Tel. Co.*, 114 D.P.R. 394 (1983).

---

[8] "Un automóvil posee poca capacidad para escapar del escrutinio público. Viaja por las distintas vías públicas y tanto sus pasajeros como su contenido están a plena vista." *Cardwell* v. *Lewis*, 417 U.S. 583, 590 (1974).

Según la prueba, Conde Pratts *no* estaba bajo arresto cuando el policía Quiñones mira y se percata del arma. Es después de verla y conocer éste que aquél carecía de licencia, que lo arresta. Esa detención se realiza en virtud de la facultad de la Regla 11 de Procedimiento Criminal.[9] Aunque, según dicho agente atestó, inicialmente no tenía suficientes motivos para arrestarlo, nada le impedía que examinara el interior del vehículo, e inclusive, a través del cristal transparente delantero mirara sus interiores.[10] Una vez notó en el piso el objeto brilloso —que por su experiencia apreció como un cañón de un arma de fuego— tenía suficientes motivos fundados para *creer* que se *había* y *estaba* cometiendo un delito en su presencia. En ese momento, según el lenguaje de la Convención Constituyente, estaba ante un "delito in fraganti", que lo exceptuaba de la necesidad de una orden. En los términos más directos, completos y suficientes poseía[11] "aquella información y conocimiento que llev[a] a una persona ordinaria y prudente a creer que el arrestado ha cometido delito". *Pueblo* v. *Alcalá Fernández*, 109 D.P.R. 326, 331 (1980); *Pueblo* v. *Cruz Rivera*, 100

---

[9] Todo funcionario del orden público puede hacer un arresto sin orden (a) cuando tuviere motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito en su presencia; (b) cuando la persona arrestada hubiese cometido un delito grave (*felony*), aunque no en su presencia; y (c) cuando tuviere motivos fundados para creer que la persona que va a ser arrestada ha cometido un delito grave (*felony*), independientemente de que dicho delito se hubiere cometido o no en realidad.

[10] "Como proposición general, es justo decir que cuando un agente del orden público puede detectar algo, utilizando uno o más de sus sentidos mientras se encuentra localizado legítimamente en el punto ventajoso que le permite usar sus sentidos, ese descubrimiento no constituye 'un registro' dentro del significado de la Cuarta Enmienda." La Fave, *op. cit.*, pág. 240.

[11] "E[se] proceso [mental] no se circunscribe a certezas inflexibles, sino a probabilidades. Mucho antes de articularse como tal la ley de probabilidades, las personas prácticas formulaban ciertas conclusiones de sentido común sobre el comportamiento humano; a los jurados, como juzgadores de hechos les está permitido hacerlo —y también a los agentes del orden público. Finalmente, la evidencia así recogida debe mirarse y sopesarse, no en términos de un análisis bibliotecario de eruditos, sino a base del entendimiento de aquellos versados en el campo de la ejecución de las leyes." (Traducción nuestra.) *United States* v. *Cortez*, 449 U.S. 411, 418 (1981).

338

D.P.R. 345, 348 (1976); *Pueblo* v. *González Rivera*, 100 D.P.R. 651, 654-655 (1972); *Cepero Rivera* v. *Tribunal Superior*, 93 D.P.R. 245 (1966); *Pueblo* v. *Cabrera Cepeda*, 92 D.P.R. 70, 74 (1965); *Pueblo* v. *Tribunal Superior*, 91 D.P.R. 19 (1964); *Pueblo* v. *Flores Valentín*, 88 D.P.R. 913, 915 (1963).

## V

Sin embargo, se insiste que era menester y que no podía incautarse del arma visible sin orden judicial. Se aduce la ausencia de circunstancias apremiantes. El enfoque confunde la razón de decidir. Parte del supuesto erróneo de que el arma fue descubierta por razón de un registro. Ese no es el caso. Aquí no hubo intrusión alguna a un ámbito de intimidad constitucionalmente protegido. El arma fue detectada por estar a vista abierta sin necesidad de registro, allanamiento o incautación. Estaba expuesta a la vista dentro del automóvil en un estacionamiento público.[12] Después que el policía aprecia visualmente su existencia y conoce que Conde Pratts no tiene licencia que le autorice su portación es que, en el descargo razonable de sus funciones, lícitamente lo arresta y la ocupa. *Pueblo ex rel. F.J.M.R.*, 111 D.P.R. 501, 503 (1981); *Pueblo* v. *Fernández*, 65 D.P.R. 497, 499-500 (1945). Se trata de una incautación incidental y contemporánea a un arresto legal. *Pueblo* v. *Del Río*, 113 D.P.R. 684 (1982). ¿Qué razón justificaba entonces posponer su incautación hasta obtener una orden judicial?

La doctrina sobre circunstancias apremiantes —como una de las excepciones válidas a un registro o incautación sin orden judicial— resulta inmaterial y nada tiene que ver con la solución del caso. Su pertinencia sólo surgiría si como

---

[12] Para casos que reconocen la admisibilidad cuando el agente se percata y distingue objetos ilegales a través de las puertas abiertas o ventanas transparentes (cerradas o no) de un automóvil, consúltense: *United States* v. *Roberson*, 650 F.2d 84, 87 (5th Cir. 1981); *United States* v. *McDaniel*, 550 F.2d 214, 218 (5th Cir. 1977); *United States* v. *Lowry*, 456 F.2d 341 (5th Cir. 1972); *Nunez* v. *United States*, 370 F.2d 538 (5th Cir. 1967); *Com.* v. *Walker*, 451 N.E.2d 737 (1983). (Parte de un revólver visto a través del cristal cerrado del automóvil y la heroína en el piso.)

resultado de una intervención de ese tipo (apremiante) se hubiese efectuado un registro, y como resultado, *hallado e incautado* algún material u objeto delictivo. En este caso es a la inversa. El arma estaba parcialmente a vista abierta. No es descubierta a base de un registro. Repetimos, el arma se reveló sin registro alguno. Observada por el agente Quiñones y comprobado su uso no autorizado, su incautación inmediata *de jure* se justificó como resultado de haberse cometido ante él un delito grave (in fraganti).

## VI

Cualquier duda sobre la validez de la incautación coetánea del arma se desvanece al evaluarse este caso, aun a base de la doctrina de objeto ilegal a plena vista. A tal efecto es menester asumir, sin resolverlo, que al estar el revólver parcialmente oculto debajo del asiento delantero, Conde Pratts intentó sustraerlo del público —aunque no totalmente— y por tanto tenía y podía reclamar una expectativa razonable de intimidad. También asumiremos, que al policía Quiñones "inclinarse y pegarse" al parabrisas delantero realizó una incursión en esa intimidad pretendida, esto es, una intrusión a una zona constitucionalmente protegida.

En *Pueblo* v. *Dolce*, supra, pág. 436, cautelosamente consignamos que sus contornos doctrinales no estaban "todavía completamente definidos". Sin embargo, recientemente el Tribunal Supremo Federal, en opinión pluralista, precisó su periferia en *Texas* v. *Brown*, supra. Hoy la doctrina se encuentra en una etapa más madura y su aceptación, como tal, es indiscutible en la mayoría de las jurisdicciones.[13]

---

[13] "El denominador común de los casos sobre la doctrina de objeto ilegal a plena vista es que en cada uno de ellos el agente tenía una justificación legítima previa para su intrusión en un área y, como resultado de ella, inadvertidamente descubrió evidencia incriminatoria. Esta doctrina suplementa la justificación original y permite la 'incautación' de la evidencia sin orden judicial." (Escolio omitido.) Comentario, *Robbins and Belton —Inconsistency and Confusion Continue to Reign Supreme in the Area of Warrantless Vehicle Searches*, 19 Hous. L. Rev. 527, 535 (1982).

"Los objetos que a sabiendas se exponen al público o son vistos por un policía situado legalmente en una posición, no están protegidos por la Cuarta Enmienda. *Katz* v. *United States*, 389 U.S. 347, 351 (1967). *Por lo tanto, cuando un objeto es visto a plena vista, no ha ocurrido un registro.*" (Énfasis y traducción nuestros.) Nota, *Retreating from Plain View: Texas v. Brown*, 37 Sw. L.J. 841, 845 n. 29 (1983).

La doctrina puede resumirse como aquella que autoriza y convalida una incautación, sin orden judicial, cuando un agente del orden público, al realizar inicialmente una intrusión válida, observa el objeto desde una posición legítima y de la cual tenía visión; tiene la certeza o razonable creencia de la naturaleza delictiva del objeto; y lo descubre "inadvertidamente".

El requisito de "inadvertidamente" ha causado mucha confusión y generado críticas. Véase, además, Comentario, *Inadvertence: The Increasing Vestigial Prong of the Plain View Doctrine*, 10 Mem. St. U.L. Rev. 399, 401–402 (1980). No significa que la Policía, cuando investiga un caso o realiza un registro, deba actuar con miopía ocular o intelectual, ingenuamente o sin imaginación.

El concepto "inadvertidamente" quiere decir que el agente no tenía conocimiento previo de la existencia, localización del objeto ilegal, y por lo tanto, no tenía intención o planes de incautarlo. "[Su] propósito es evitar que un registro autorizado limitado se convierta en uno general. El requisito de que la Policía obtenga una orden cuando anticipa el descubrimiento de evidencia, conoce su localización y desea incautarla, es un gravamen exiguo en un sistema legal que contempla los registros e incautaciones sin orden, como irrazonables. *En contraste, requerir tal orden para evidencia descubierta inadvertidamente durante una intrusión válida, resulta en grandes inconvenientes para la Policía. Los agentes se verían forzados a guardar la evidencia mientras obtienen la orden o arriesgarse a perderla durante su ausencia.*" (Énfasis suplido y escolio omitido.) *Retreating from Plain View*, supra, pág. 846.

Todos los requisitos de la doctrina están presentes bajo la hipótesis asumida. El policía Quiñones estaba legítimamente en el estacionamiento público; en el curso de una intromisión válida (mirar con cuidado hacia el interior del auto) sin necesidad de orden y mediante una sencilla diligencia vio y reconoció parte de un arma de fuego; y esa observación no fue producto de un conocimiento previo, o sea, fue inadvertida. Sobre este último extremo, sostener que su curiosidad investigativa derrota la aplicación de la doctrina es sencillamente no entenderla. En la prevención e investigación del crimen la Policía no es una esfinge egipcia obligada a adoptar una actitud reservada o enigmática.

## VII

Resumiendo, en la circunstancia de este caso, bajo cualesquiera de las alternativas doctrinales expuestas, no tiene razón el apelante Conde Pratts en su planteamiento de que era menester una orden previa judicial de incautación.

Demostradamente su proposición de inconstitucionalidad está fundada en una premisa errónea. Más aún, en el fondo advertimos una contradicción. Nos explicamos. La legalidad del arresto sólo subsiste si le atribuimos algún valor jurídico al descubrimiento por el policía, desde el exterior, del arma dentro del vehículo. El eslabón faltante entre una simple conducta sospechosa y el estado mental de "motivos fundados" necesario para justificar el arresto válido sin orden lo constituyó precisamente el descubrimiento del arma y su aparente ilegalidad a plena vista. ¿Cómo sostener entonces esa legitimidad y negarle igual consecuencia jurídica para su rápida ocupación? ¿Cómo conciliar que en un momento dado el policía Quiñones pudiera visualmente detectarla —en virtud de cuyo hallazgo realice un arresto válido sin orden judicial— y segundos después se le requiera una orden para ocuparla?

Finalmente, ¿constituyó ello una incautación irrazonable? El adjetivo "razonable" implica una acción conforme a

la razón. Versa sobre realidades eminentemente pragmáticas, de carácter relativas y flexibles. En diferentes épocas y momentos conlleva variados significados y grados. Contempla situaciones inesperadas, más o menos imperiosas y urgentes, en que la libertad y curso de acción para actuar de diversos modos se reduce notablemente. El concepto rehúye una mecánica apriorística. La variabilidad en el comportamiento del ser humano envuelto en todo acto criminoso, los distintos trasfondos (sitio, hora, personas, edades y naturaleza y gravedad del acto) son factores pertinentes para evaluar la razonabilidad de un registro y allanamiento sin orden judicial. Lo razonable descansa en lo moderado y prudente de la acción u omisión.

Así entendida, la exigencia de una orden para ocupar el arma visible es irrazonable. Se nutre de especulaciones. Nada en la prueba apoya la proposición de que el Estado hubiera podido obtenerla sin comprometer su eficacia o la seguridad de los agentes a base de varios supuestos: que el automóvil estaba inmovilizado, cerrado; su dueño bajo arresto; no tenía acceso a armas o a posibles cómplices; y se cuenta con personal suplementario que pueda vigilar el automóvil o efectuar arreglos para su remoción a algún cuartel o lugar bajo el control de la Policía.

Un revólver es un instrumento, por sí mortífero, suficientemente peligroso. Existe un interés superior comunitario, declarado legislativamente, de que tales instrumentos constituyen un "estorbo público". 25 L.P.R.A. sec. 444. Comprobada su ilegalidad, la Policía podía y debió —como lo hizo— ocuparla inmediatamente. No es determinante entonces que el automóvil estuviera estacionado, cerrado y arrestado su conductor. Ciertamente, es cuestionable que el revólver pudiera dejarse seguro allí. El atractivo de un arma de fuego parcialmente visible al público en general aconsejaba lo contrario. El peligro de que desapareciera, de permanecer sin custodia dicho automóvil, era real. Por otro lado, no existe la más mínima evidencia de que la Policía

contara con "personal suplementario" para montar vigilancia especial por todo el tiempo que de ordinario toma trasladarse, preparar la documentación y obtener una orden judicial en la concurrida Sala de Investigaciones del Centro Judicial de San Juan. Si Conde Pratts ya estaba válidamente arrestado por alegadamente poseer y transportar el arma que visiblemente el agente Quiñones conocía que estaba dentro del vehículo, ¿por qué era necesaria una orden previa judicial para su pronta incautación? ¿Por qué ignorar el mandato legislativo de estorbo público y no remediarlo mediante su ocupación coetánea? ¿Qué valor constitucional o de qué forma ello protegía el derecho a la intimidad de Conde Pratts?

Tampoco hay prueba sobre la disponibilidad de "efectuar arreglos para su remoción a algún cuartel o lugar bajo el control de la Policía". Presumiendo la existencia de esos medios y facilidades, (14) esa medida resulta en un doble contrasentido, pues, ¿cómo justificar esa remoción sin mandamiento judicial? ¿Qué resulta más gravoso e irrazonable para la intimidad del ciudadano, la sola incautación del arma o la proveniente de la remoción total del vehículo? (15)

Las alternativas de traslado "a algún cuartel o lugar bajo el control de la Policía", ¿evitan —o por el contrario invitan— a que se susciten controversias fácticas en torno a la posible introducción subrepticia en el vehículo de otro material delictivo imputable también al ciudadano que está ausente?

Ante estas incógnitas, la opción teórica de no tocar ni

---

(14) El Tribunal Supremo federal ha rechazado imponerle a la Policía el requisito constitucional "de tener disponible el personal y equipo necesarios para transportar vehículos allanados a una localización central hasta tanto se obtenga una orden judicial". *Arkansas* v. *Sanders*, 442 U.S. 753, 765 (1979). Ello representaría "un gravamen severo, casi imposible" de acatar. Íd., pág. 766 esc. 14.

(15) "Para propósitos constitucionales, no vemos diferencia entre, de un lado incautar y retener un vehículo antes de presentarle a un magistrado el asunto sobre causa probable, y del otro, el haberse efectuado inmediatamente un registro sin la orden." *Chambers* v. *Maroney*, 399 U.S. 42, 52 (1970).

ocupar el arma de inmediato, cuya visibilidad dio margen a un arresto válido, sino hasta la obtención de una orden judicial —con el riesgo de que en el entretanto fuera removida por un tercero delincuente o sucedieran eventos incontrolables— pertenece al ámbito de lo abstracto y no al de la adjudicación "razonable" del derecho constitucional vigente. "El jurista, como intérprete, puede serlo de un derecho histórico o de un derecho vigente. . . . La diferencia fundamental entre una y otra interpretación jurídica consiste en que en la histórica se trata únicamente de reconstruir en su coherencia originaria, o de integrar en su autónoma totalidad, el sentido —en sí mismo concluso— de una norma o de un instituto, mientras que, por el contrario, en la interpretación de un orden jurídico vigente *no puede quedarse el jurista en averiguar el sentido originario de la norma,* pues ésta, lejos de agotarse en su primitiva formulación, tiene vigor actual junto con el ordenamiento del que forma parte integrante *y está destinada a pasar y a injertarse en la vida social a cuya ordenación debe servir.* Por eso, en el caso de la interpretación del derecho vigente, el jurista no ha cumplido con su misión cuando ha reconstruido la idea originaria de la fórmula legislativa —cosa que, desde luego, tiene que hacer— sino que debe, además, poner de acuerdo aquella idea con la actualidad, infundir a aquella idea la vida del momento presente, porque precisamente al presente y no al pasado debe referirse la valoración normativa de la que hablamos. En pocas palabras, aquí en la interpretación del derecho vigente, se trata no sólo y no tanto de ir a buscar el objeto de la interpretación, manteniéndolo en su primitivo puesto de colocación histórica, sino sobre todo de hacer mover el objeto en busca del sujeto intérprete, haciéndolo partícipe de la viva actualidad de éste y adherente a la dinámica perenne de la vida social." E. Betti, *La Interpretación del Derecho,* 33 Rev. Facultad Der. 9 (1966).

Deben confirmarse las sentencias.