EL PUEBLO DE PUERTO RICO, apelado, *v.* MANUEL LUZÓN y MIGUEL BAUZÁ TORRES, acusados y apelantes.

*Número:* CR-81-48 *Resuelto:* 19 de octubre de 1982

316

*José Torres Ortiz,* abogado de los apelantes; *Héctor A. Colón Cruz, Procurador General,* y *Ricardo E. Alegría Pons, Procurador General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Manuel Luzón Rodríguez y Miguel Bauzá Torres fueron acusados, juzgados y encontrados culpables por jurado de violar el Art. 213 del Código Penal, ya que al actuar en común acuerdo, el 25 de octubre de 1979, "ilegal, voluntaria, maliciosa y criminalmente obtuvieron de John Caro, Agente Especial del Negociado de Investigaciones Especiales del Departamento de Justicia, un beneficio consistente en dinero, asegurando o pretendiendo que se hallaban en aptitud de influir a la policía de Puerto Rico para que no

interv[inieran] con las actuaciones ilegales que ocurriesen o pudiesen ocurrir en las discotecas Hollywood, San Juan-San Juan y Star. . .". Fueron sentenciados a pena de presidio de tres (3) a cinco (5) años, con trabajos forzados, la cual les fue suspendida.[1]

En apelación, discuten cinco errores que evaluaremos siguiendo nuestro propio orden de adjudicación.

## I

■ La prueba del Pueblo es insuficiente para establecer una convicción más allá de toda duda razonable.

■ Incidió el Tribunal en las Instrucciones al Jurado y en su negativa a Instruir al Jurado en relación a Instrucciones Especiales solicitadas por la Defensa a fines de una adecuada interpretación del Artículo 213 del Código Penal de Puerto Rico sobre Influencia Indebida.

Examinemos estos dos señalamientos en conjunto.

En el primero, los apelantes no impugnan la calidad de la prueba, más bien la predican en dos proporciones, a saber: (1) que "el beneficio no era para los acusados y sólo se aceptaba una donación para la campaña política de un Partido legítimamente organizado"; y (2) que la "influencia no era para actos ilegales por parte de las discotecas o sus dueños ni para que la policía no cumpliese con algún deber ministerial". No tienen razón.

La Exposición Narrativa de la Prueba, corroborada por las fotografías y "video tapes" presentados en evidencia al jurado, sostienen más allá de duda razonable el veredicto de culpabilidad. Dicha prueba, en síntesis, demostró que el apelante Manuel Luzón, empleado de la Cámara de Representantes, en unión al co-apelante Lic. Miguel Bauzá —asesor legal de la Comisión de Industria y Comercio, presidida durante el cuatrienio anterior por el Sr. Antonio Sagardía Sánchez— hizo gestiones para recibir de los

---

[1] Manuel Luzón Rodríguez fue sentenciado, además, a 30 días de cárcel por desacato. También le fue suspendida la sentencia. No apeló la misma.

señores John Seath(²) y William Cieslack (con la participación del agente encubierto John Caro Miranda del Negociado de Investigaciones Especiales (N.I.E.) del Departamento de Justicia) una contribución de $50,000, alegadamente, para la campaña del Partido Nuevo Progresista; que a cambio de ello, se comprometieron a realizar las gestiones conducentes a que la Policía de Puerto Rico no interviniera con las discotecas Hollywood, Star y San Juan-San Juan y, además, a obtener un "permiso de uso" para la discoteca San Juan-San Juan; que luego de varias conversaciones y

---

(²) Este testigo en lo pertinente declaró:

"En la mañana del 7 de septiembre de 1979, como a las 2:00 a.m., en la discoteca San Juan-San Juan, volvió a ver al señor Manuel Luzón y éste le entregó una citación para que compareciera ese mismo día a las 10:00 a.m., a la Comisión de Industria y Comercio. Que el testigo fue solo a la oficina del Representante Sagardía ese mismo día. Que en la sala de la recepcionista se encontró con el señor Manuel Luzón y éste lo llevó a una oficina privada que queda en las oficinas del Representante Sagardía. Que conversó a solas con el señor Luzón y éste le explicó la gran necesidad de dinero para la campaña de reelección del Gobernador Romero Barceló para el año 1980. Que el señor Luzón le manifestó que a todas las comisiones de la Cámara de Representantes y el Senado se les había asignado ciertos sectores de la economía para levantar fondos para la campaña del gobernador para el 1980. Que la Comisión de Industria y Comercio presidida por el Representante Sagardía, se le había asignado el sector de la economía que comprendía el negocio de discotecas, club[es] nocturnos y entretenimiento, y como su negocio estaba en esa área o sector se le estaban acercando a él para que contribuyera en la campaña de reelección del Gobernador Romero Barceló. Que el testigo le preguntó al señor Luzón si habían hecho algún acercamiento a otros negocios y éste le mostró una lista de discotecas con las cantidades que están contribuyendo [sic]. Que el señor Luzón destruyó la lista de discotecas y la citación y las tiró en un zafacón porque según Luzón eso era algo confidencial. Que él preguntó qué se esperaba de él como representante de las discotecas San Juan[-]San Juan, Star y Hollywood. El señor Luzón le dijo que ellos (el testigo y sus socios) tenían problemas y él sabía que la Policía había hecho redadas en las discotecas y habían registrado a los clientes sin orden de registro. Que él (Luzón) tenía conocimiento de una bomba de gases lacrimógenos en una discoteca. Que por una contribución de diez mil dólares ($10,000.00) por cada una de las discotecas, y a través del Representante Sagardía podría recibir a cambio protección del hostigamiento por parte de la policía u otras agencias. Que él le preguntó al señor Luzón que si los $30,000.00 dólares le podrían ayudar con un caso de corte que tenían pendiente hacía año y medio en relación con el permiso de uso de la discoteca San Juan-San Juan. Que Luzón le contestó que no, que por veinticinco mil dólares ($25,000.00) adicionales la Comisión de Sagardía y con amigos trataría de que los papeles de la discoteca San Juan-San Juan, fueran tramitados y obtendría una Resolución favorable." (E.N.P., págs. 9–10.)

reuniones preliminares al efecto, el jueves 25 de octubre de 1979, los apelantes Luzón y Bauzá convinieron y se reunieron con Caro Miranda[3] —que intervino desde su origen con el nombre ficticio de Robert Bittel, pretendiendo ser uno de los condueños de las mencionadas discotecas— en el Hotel Caribe Hilton, área de la piscina, y recibieron de manos de Caro un maletín que contenía en apariencias, la

---

[3] En parte declaró:

"Que él (Caro) le preguntó de qué se trataban los $50,000.00 dólares y Luzón le contestó que eso era para la reelección del Gobernador Carlos Romero Barceló. Que la Comisión se había portado bien ya que habían encontrado heroína, cocaína, armas de fuego y que no le habían sometido ningún caso; y que ya se había llamado al juez para que fallara a su favor y se estaban tardando en pagar. Que Seath le habló de las primarias y Luzón le contestó que eso tardaba mucho, que él se refería a la Conquista del Oeste en Mayagüez y que para eso se necesitaba mucho dinero. Que él le preguntó que si se le daban los $50,000.00 dólares qué garantía habrá de que la [P]olicía no entre en las discotecas. Que Luzón contestó que la Comisión le habrá de entregar unos certificados y que con esos certificados los podía enseñar para que la [P]olicía los dejara quietos. Luzón dijo que la Comisión tenía poderes sobre la [P]olicía, el Departamento de Hacienda y que ellos eran los que llegaban a esas personas. Que durante las elecciones se presiona a todos los negocios y hasta los negocios de prostitución también pagaban. Que él trabajaba para el Gobierno de Romero Barceló y que con Hernández Colón se hacía lo mismo para aquella campaña.

. . . . . .

"Que luego de entregado el papel Luzón les dijo que si estaban listos para ver al Presidente de la Comisión de Industria y Comercio. Que ellos entraron en otra oficina donde estaba el Representante Sagardía y el Lcdo. Miguel Bauzá. Que no los había visto antes. Que en total en dicha oficina habían [sic] seis (6) personas, Sagardía, Bauzá, Luzón, Seath, Cieslack y él. Que Luzón les presentó a Sagardía y al Lcdo. Bauzá. Que los presentó como condueños de las discotecas. Que luego Sagardía los felicita por la ayuda que le habían dado a la Comisión. Que la felicitación era para Seath, Cieslack y a él. Que Sagardía le pidió a Luzón que la secretaria que estaba afuera les preparara unos certificados como miembros honorarios de la Comisión. Que el testigo declara que él personalmente no había hecho ninguna labor a favor de la Comisión de Industria y Comercio.

"Que Sagardía dijo que la Comisión había terminado la investigación y que la [P]olicía ya no podrá intervenir más allí en las discotecas. Que Sagardía le solicitó al Lcdo. Bauzá que llamara a Desiderio Cartagena y al Coronel Miguel Rivera y éste último lo escribió en la pizarra. Que Sagardía entonces le preguntó si había alguna otra pregunta. Que él ([el] testigo) le preguntó qué iba a pasar con la discoteca San Juan-San Juan, y Sagardía le dijo que él iba a bregar con los padrinos de los jueces y que allí se bregaba así, que cada juez tenía su padrino. Que el Lcdo. Bauzá dijo que Sagardía tenía amigos con los padrinos de los jueces." (E.N.P., págs. 31 y 34.)

suma pactada de $25,000 en efectivo. En el maletín sólo había $3,112, ingeniosamente presentados, simulando la cantidad mayor. Que toda esa operación y las anteriores estuvieron coordinadas con la Policía y el acto de entrega fue filmado en video y fue fotografiado. Instantes después de entregado el maletín, Luzón y Bauzá fueron arrestados en dicho hotel por los agentes Colón Fraderas, Pomales y Cardona según instrucciones previas acordadas como parte del desenlace final de la operación.

La prueba antes relatada enmarca perfectamente el delito de Influencia Indebida tipificado en el Art. 213 del Código Penal que reza:

> Toda persona que obtuviere o tratare de obtener de otra cualquier beneficio asegurando o pretendiendo que se halla en aptitud de influir en cualquier forma en la conducta de un funcionario o empleado público en lo que respecta al ejercicio de sus funciones será sancionada con pena de reclusión por un término fijo de tres (3) años. 33 L.P.R.A. sec. 4364.

■■■ El precepto es amplio. Intenta tutelar el descargo honesto, libre de intervención o fuerza moral extraña en el ánimo de todo servidor en su función pública. Su prohibición se extiende a cualquier persona. No se limita a funcionarios o empleados públicos. Tampoco exige que el autor del acto se beneficie en su propio patrimonio. Basta que obtenga o intente obtener cualquier beneficio, que puede ser pro un tercero. Adviértase que la definición estatutaria de *beneficio* abarca "[c]ualquier provecho, utilidad, ventaja, lucro, o ganancia, no estando limitado el término a una ganancia pecuniaria o material, *sino que denota cualquier forma de ventaja*". Art. 7(6), 33 L.P.R.A. sec. 3022(6). (Énfasis suplido.) Carece, pues, de méritos la proposición argumentada sobre el propósito de la influencia. El estatuto penaliza el tratar o lograr un beneficio por pretender ejercer una influencia —real o imaginaria— en cualquier forma en la conducta de un funcionario, en lo que respecta al ejercicio de sus funciones.

■ No obstante la amplitud del precepto, los apelantes pretenden circunscribir su aplicación únicamente cuando la influencia va dirigida a que el funcionario actúe en forma ilegal. Fundados en esa tesis solicitaron la siguiente instrucción especial al jurado:

> El Artículo 213 del Código Penal al referirse a "influenciar a un funcionario y/o empleado público en cualquier forma" debe interpretarse que la influencia va dirigida a que el funcionario público o empleado público actúe en forma ilegal y/o contrario a sus funciones legítimas y propias de su cargo.

> No hay violación del estatuto si la influencia de que se trata es para que un funcionario o empleado público cumpla con su deber. Un acto y/o intervención ilegal, injustificada, o irrazonable de la policía, funcionario o empleado público no constituye parte de sus funciones y deberes.

El ilustrado tribunal sentenciador correctamente se negó a impartirlas. Hemos visto que el texto de ley no establece distinción en cuanto al carácter o propósito a que va dirigida la influencia; puede ser tanto legítimo como ilegal. Ambas modalidades están comprendidas. La razón es sencilla. El interés protegido, evidentemente, es el fiel desempeño del ejercicio por funcionarios públicos, sin que para ello medie el pago de emolumentos bajo la prédica de una supuesta influencia. Tan nociva es una práctica como la otra. En última instancia, permitir el pago por influencias, aun si los móviles perseguidos son legítimos, conllevaría la instauración e implementación de un régimen gubernamental basado en el trato preferente y ventajoso en que el dinero o el provecho sería el criterio determinante. A corto o largo plazo, ello degeneraría en la corrupción del sistema de administración pública.

## II

■ Incidió el Tribunal al permitir al Pueblo traer prueba sobre un supuesto ofrecimiento de influencia indebida a un Juez Superior — Sala de San Juan, sin estar dicha

alegación contenida en el texto de las acusaciones y sin que las acusaciones fueran enmendadas y a pesar de las objeciones de la Defensa.

Los apelantes sostienen que, ante la alegación específica en el pliego acusatorio de que acordaron obtener dinero en beneficio "asegurando o pretendiendo que *podían influir a la policía de Puerto Rico* para que ésta no interviniera en actuaciones ilegales que ocurrieran o pudiesen ocurrir en unas discotecas en San Juan-San Juan, Hollywood y Star", erró el tribunal sentenciador al permitir que se desfilara prueba de que ellos ofrecieron influenciar a un juez superior en relación con el desenlace de un caso judicial sobre el permiso de uso de la discoteca San Juan-San Juan. (Énfasis nuestro.)

Ciertamente, a los apelantes no se les juzgaba de pretender influenciar a un magistrado, sino a la Policía. Pero desde el inicio del proceso, los testigos principales de cargo John Seath y John Caro, *sin objeción oportuna de la defensa*, depusieron que parte del acuerdo comprendía "ayudar con un caso en corte que tenían pendiente hacía año y medio en relación con el permiso de uso de la discoteca San Juan-San Juan". (E.N.P., págs. 10, 13, 14, 31, 34 y 38.) No es hasta el turno de contrainterrogatorio de Caro e, inclusive, luego de estipular todas las partes que determinado juez no estaba interviniendo en el caso *A.R.P.E.* v. *Seath* (P.E. 78-1620), que se suscita el incidente de que en la denuncia original no se mencionó "nada sobre el permiso de uso de las discotecas". (E.N.P., págs. 51–52.)

Aparte de lo tardío del planteamiento, difícilmente podía haber expuesto el Ministerio Fiscal, en su visión integral, el caso ante el jurado sin que sus testigos mencionaran ese detalle. Desde la primera reunión —7 de septiembre de 1979— en la oficina del representante señor Sagardía, surge el ofrecimiento de poder ejercer influencia indebida sobre un magistrado, conjuntamente con la Policía. En estas circunstancias es improcedente el señalamiento.

III

 Incidió el Tribunal al admitir en evidencia el maletín y contenido ocupado al apelante Miguel Bauzá Torres, por ser la misma el producto de una detención, arresto, ocupación y registro ilegal e irrazonable y en violación a los derechos constitucionales de los apelantes.

La posición de los apelantes es que sus arrestos fueron ilegales y que el maletín ocupado incidentalmente a Miguel Bauzá fue producto de un registro irrazonable. Aducen que los agentes que los arrestaron no tenían conocimiento personal del caso y carecían de motivos fundados. No tienen razón.

Primeramente, la Exposición Narrativa de la Prueba refleja que, *sin objeción* de la defensa, fueron admitidos los *exhibits* 31 al 37, los cuales incluyen las fotografías que demuestran "la entrega del maletín a Bauzá y Luzón en la piscina del Caribe Hilton y el contenido del maletín". (E.N.P., pág. 40.) Causa, pues, extrañeza que se produzca este señalamiento.

Independientemente de lo expuesto, según ya hemos indicado, la prueba demuestra que el arresto de los apelantes se debió a un coordinado esfuerzo entre el Negociado de Investigaciones Especiales del Departamento de Justicia y la Policía. A tal efecto, el día del arresto, el agente José Colón Fraderas fue al Caribe Hilton en un vehículo junto con los agentes Elías Oscar Pomales, y Muñoz, para asignarles —como lo hizo— sus puestos en la hospedería y darles instrucciones de que esperaran que el agente John Caro entregara el maletín con el dinero a unas personas y entonces procedieran a arrestarlas. Desde los comienzos de la investigación, el agente Colón Fraderas estuvo recibiendo información sobre lo sucedido tanto del agente Sanjurjo como de Caro. Su intervención específica con los apelantes la describe así:

Que como a las 9:00 a.m. Caro bajó en traje de baño al área de la piscina y puso el maletín en una mesa, el cual tapó con

una toalla. Que él (Colón Fraderas) tenía un "walkie-talkie" en su poder. Que como una hora después recibió una llamada por el "walkie-talkie" y abrió la puerta de la cabaña y le dijo a Caro que las personas que él esperaba llegaron. El testigo describe el maletín Samsonite. Que él se encontraba como de 20 a 25 pies de donde estaba Caro sentado. Que Caro se había quedado descansando y conversando con un niño. Que ninguna persona se le acercó al maletín. Que Caro trajo a Bauzá y a Luzón a la mesa y empezaron a conversar. Que mientras estaba conversando con Bauzá sacó de un sobre unos papeles y se los mostró a Caro. Que Caro le quitó la toalla al maletín y lo abrió y le mostró a Bauzá y a Luzón el contenido. Que lo cerró y lo volvió a abrir por segunda vez. Que Bauzá hace un gesto con las manos y Caro lo cerró. Que al poco tiempo después Bauzá coge el maletín y se despiden. Que camino al "lobby" iban Bauzá y Luzón. Que ellos (Colón Fraderas, Pomales, Cardona) salieron tras Bauzá y Luzón, que le dieron alcance estando todavía en el área de la piscina y los arrestaron. Que ellos se identificaron con el "carnet" del N.I.E. y le dijo quiénes eran y él le leyó los derechos constitucionales. Que él (Colón Fraderas) arrestó al señor Luzón. Que Pomales arrestó a Bauzá. Que cuando Pomales arrestó a Bauzá le ocupó el maletín que Bauzá tenía en la mano. (E.N.P., págs. 59-60.)

Las circunstancias expuestas confirman la legalidad de los arrestos. El concepto de motivos fundados, consignado en la Regla 11 de Procedimiento Criminal, no es incompatible con la persecución del crimen, cuando actúen coordinada y concertadamente los agentes de la Policía. A tal efecto, se ha sostenido que el conocimiento de cada agente —cuando trabajan cerca y se mantienen informados— es atribuible a los demás. "Se puede establecer la existencia de causa probable para justificar un arresto sin orden, basado en información policiaca colectiva al momento del mismo, siendo innecesario que el oficial que lleva a cabo el arresto lo haga basándose únicamente en su conocimiento personal de las circunstancias. Basta con que el agente de la Policía que inició la cadena de comunicaciones tenga información de primera mano." (Traducción nuestra.)

J. A. Varon, *Searches, Seizures and Immunities*, 2da ed., Indianapolis, Bobbs-Merrill Co., Inc., 1974, Vol. I, pág. 128. Véanse *United States* v. *Rose*, 541 F.2d 750, 756 (1976); *United States* v. *Stratton*, 453 F.2d 36 (1972); *United States* v. *Pitt*, 382 F.2d 322, 324 (1967).

## IV

■ Incidió el Tribunal al admitir en evidencia la prueba de retratos y películas en movimiento por haber sido gran parte de las mismas tomadas en lugares y situaciones protegidas constitucionalmente contra intromisiones indebidas del Estado.

■ Independientemente de que los autos revelan que sólo el co-apelante Manuel Luzón objetó la admisibilidad de once cintas de "video tapes"; y del maletín y su contenido —lo cual dispondría del planteamiento en cuanto al apelante Bauzá— la jurisprudencia reconoce su valor evidenciario, no como de índole incriminatoria per se sino de tipo corroborativo. Así, en *United States* v. *White*, 401 U.S. 745, 751 (1971), se dijo que, para propósitos constitucionales, se obtiene el mismo resultado si un agente prepara un informe y pone por escrito una conversación justo después de haberla sostenido con un acusado, o si se realiza el informe mediante la grabación o transmisión —con equipo electrónico que lleve consigo el agente— de dicha conversación.

El Tribunal Supremo terminó diciendo:

*Nuestro problema, en términos de los principios propuestos en Katz, es determinar qué expectativas de intimidad son constitucionalmente "justificables" —qué expectativas están protegidas por la Decimocuarta Enmienda en ausencia de una orden de registro.* Hasta ahora, la ley da pie a que se frustren las expectativas de intimidad al permitirle a las autoridades usar el testimonio de aquellos socios que por alguna razón han decidido recurrir a la Policía, y al autorizar el uso de informantes como se hizo en los casos de *Hoffa* y *Lewis*. Si la ley no protege al causante de daño cuyo cómplice confiable es o se convierte en un agente de la Policía, tampoco debe prote-

gerlo cuando ese mismo agente ha grabado o transmitido la conversación que habrá de presentarse más adelante como prueba de cargo. Véase *López* v. *United States*, 373 U.S. 427 (1963). (Traducción nuestra y énfasis suplido.) *White*, supra, pág. 752.

En el caso de autos, es incuestionable que el uso del "video tape" y la fotografía perpetuaron de manera certera, eficiente y confiable —más allá de la capacidad normal de los sentidos humanos— la conducta incriminatoria de los apelantes. Como medio para perpetuar un testimonio, es incalculable su valor evidenciario. W. Ringel, *Searches & Seizures, Arrests and Confessions*, 2da ed., New York, Clark Boardman Co. Ltd., 1981, Sec. 8.6, págs. 8-36–8-40.1. Los sitios donde fue filmado y fotografiado el apelante Luzón —los alrededores de la piscina y el vestíbulo del Hotel Caribe Hilton, la azotea, terraza abierta y puerta exterior de la residencia del señor John Seath, la Calle Sol en San Juan y la entrada al Capitolio— no son lugares en los cuales él podía tener ni reclamar una "razonable expectativa de privacidad". *Sponick* v. *City of Detroit Police Department*, 211 N.W.2d 674, 690 (1973). Los factores a ponderarse bajo ese criterio rector de: (1) derechos de propiedad individuales; (2) las precauciones adoptadas para mantener una intimidad; y (3) las características del lugar, incluso su accesibilidad a la observación, militan en su contra. Véase: *Katz* v. *United States*, 389 U.S. 347, 351–352 (1967); *Rawlings* v. *Kentucky*, 448 U.S. 98 (1980); *United States* v. *Salvucci*, 448 U.S. 83 (1980); *Rakas* v. *Illinois*, 439 U.S. 128 (1978). J. Schwartz, *Judicial Acceptance of Video Tape as Evidence—People* v. *Teicher*, 16 Am. Crim. L. Rev. 183 (1978); Annot., *Admissibility of Videotape Film in Evidence in Criminal Trial*, 60 A.L.R.3d 333 (1974); W. R. LaFave, *Search and Seizure*, St. Paul, Minnesota, West Publishing Co., 1978, Secs. 2.1 a 2.4, págs. 221–349. Igual resultado se impone en cuanto a Bauzá.

*Por los fundamentos expuestos, se dictará sentencia confirmatoria.*