EL PUEBLO DE PUERTO RICO, recurrido, *v.* JOSÉ E. PÉREZ NARVÁEZ, peticionario.

*Número:* CE-90-895          *Resuelto:* 8 de junio de 1992

*Antonio Miguel Sagardía*, abogado del peticionario; *Jorge E. Pérez Díaz, Procurador General, Norma Cotti Cruz, Procu-*

*radora General Interina*, y *Blanca A. Díaz Segarra, Procuradora General Auxiliar*, abogados de El Pueblo.

EL JUEZ PRESIDENTE SEÑOR ANDRÉU GARCÍA emitió la opinión del Tribunal.

El 21 de junio de 1990 el peticionario, José E. Pérez Narváez, fue denunciado por dos (2) infracciones a la Ley de Sustancias Controladas de Puerto Rico. El 6 de septiembre de 1990 se celebró la vista preliminar en la cual se determinó causa probable por los dos (2) casos mencionados, formulándose posteriormente las correspondientes acusaciones. El peticionario presentó una moción de supresión de evidencia a tenor con la Regla 234 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, la cual fue declarada sin lugar el 7 de noviembre de 1990. De dicha determinación acude el peticionario ante este Tribunal.

Vista la petición de *certiorari* presentada, concedimos al Procurador General (Procurador) el término de veinte (20) días para que mostrara causa por la cual no debiera revocarse la resolución recurrida. El Procurador, efectivamente, ha comparecido, por lo que estamos en posición de resolver.

## I

Los hechos que dan lugar al presente recurso son los siguientes:

El 15 de junio de 1990, un tal John Bron envió desde Saint Thomas, Islas Vírgenes, a través del Federal Express, un paquete dirigido a *Century Funeral Home* (en adelante *Century*), Calle Loíza #259, Santurce. Desde dicha isla, el mencionado paquete (AIR WAYBILL #400-7375-8801 de Federal Express) fue transportado por avión a la oficina de Federal Express en Memphis, Tennessee.[1] En

---

[1] Por acuerdo entre la Agencia Federal de Aduana y la Compañía Federal Express, todo paquete que transporte la compañía desde Saint Thomas deberá en-

esa oficina, el inspector de aduana, Thomas Hobach, al llevar a cabo el registro rutinario de paquetes que provienen del exterior, encontró que el mismo contenía dos (2) libras de picadura de marihuana. El inspector Hobach, luego de dar conocimiento de tal hallazgo a sus superiores, les hizo entrega del paquete. Éstos, a su vez, le enviaron el paquete a la agente Marylin García, quien se encontraba de turno en la Oficina de Aduana de San Juan. Ésta, luego de cotejar su contenido, hizo entrega del mismo al agente Julio Alvarado de la División de Drogas de San Juan. Una vez el agente Alvarado tuvo en sus manos el paquete, lo llevó a las oficinas de dicha división y allí le realizó una prueba de campo, arrojando la misma positivo de picadura de marihuana. El mismo día, el agente corroboró la dirección de *Century*.

El agente Alvarado le dio instrucciones al agente Rafael Guzmán Muller de que pasara por las oficinas de Federal Express, de donde tomaría un uniforme y un vehículo para entregar el paquete a *Century*. Luego de que entregara el paquete, tendría que obtener una orden de allanamiento. El mismo día, el agente Guzmán se presentó a *Century* y le hizo entrega del paquete al Sr. José Pérez Narváez, gerente de la mencionada funeraria. Procedió entonces a prestar una declaración jurada sobre la entrega del paquete, obteniéndose de este modo una orden de allanamiento contra *Century Funeral Home*. Se dirigió luego a la funeraria y, una vez allí, tocó el timbre de la puerta principal. Al nadie responderle, se identificó como policía, escuchó el correr de personas en el interior y entonces decidió forzar la entrada. Una vez en el interior del edificio, procedió a detener a unos individuos en el primer piso y se encontró con el acusado en el *lobby*. Allí le entregó copia de la orden de allanamiento y, según el testimonio del agente Guzmán Muller, el peticionario le dijo: "Sube que lo que tú

---

viarse a Memphis como primer puerto de entrada a Estados Unidos.

vienes a buscar está arriba." Petición de *certiorari*, pág. 4. La evidencia fue ocupada por el agente Guzmán en el segundo piso de la estructura, lugar que resultó ser la residencia del peticionario.[2] En el primer piso de la estructura, en el que se encuentra la funeraria, no encontró evidencia delictiva alguna.

Ante nos, el peticionario plantea cinco (5) cuestiones de derecho. En primer lugar, señala el hecho de que el agente Alvarado debió haber obtenido originalmente una orden de allanamiento para abrir el paquete cuando lo recibió de la agente Marylin García, a los fines de hacerle la correspondiente prueba de campo al contenido del mismo. Los restantes señalamientos se reducen a cuestionar la suficiencia de la orden de allanamiento. Aduce el peticionario que dicha orden no confería autoridad a los agentes del orden público para allanar su residencia, la cual se encuentra en el segundo piso de la estructura.

## II

El primer señalamiento del peticionario, sobre la supuesta obligación del agente de obtener una orden de allanamiento a los fines de ocupar y abrir —para examinar su contenido— el paquete "privado" de Federal Express, es inmeritorio. El Art. II, Sec. 10 de la Constitución del Estado Libre Asociado dispone:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
>
> No se interceptará la comunicación telefónica.
>
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirma-

---

[2] Dicha evidencia consistió, además del paquete, de varios *decks* de cocaína, de veintiunmil dólares ($21,000) de una caja fuerte, y ciento veinticuatro (124) *decks* de marihuana.

ción, describiendo particularmente el lugar a registrarse, y las personas a detenerse o las cosas a ocuparse.

Evidencia obtenida en violación de esta sección será inadmisible en los tribunales. L.P.R.A., Tomo 1, ed. 1982, pág. 299.

■ La citada cláusula constitucional "está orientada a proteger a la persona, pertenencias e intimidad del hogar o propiedad frente al abuso de poder por parte del Estado. Se trata, específicamente, de proteger la intimidad de las personas, así como la inviolabilidad del domicilio o propiedad (*e.g.*, automóvil, papeles, libros, etc.), frente a cualquier irrazonabilidad del Estado al utilizar su autoridad limitada por ley para realizar registros y allanamientos". (Énfasis en el original.) D. Nevares-Muñiz, *Sumario de Derecho Procesal Penal puertorriqueño*, 3ra ed., Hato Rey, Ed. Inst. Desarrollo del Derecho, 1989, pág. 61. La protección constitucional se refiere a aquella propiedad sobre la cual la persona tenga una legítima expectativa de privacidad. Véanse: *Pueblo v. Luzón*, 113 D.P.R. 315 (1982); *Pueblo v. Lebrón*, 108 D.P.R. 324 (1979); *Katz v. United States*, 389 U.S. 347 (1967); *Pueblo v. Ríos Colón*, 129 D.P.R. 71 (1991); *Pueblo v. López López*, 129 D.P.R. 310 (1991).

Con el fin de determinar si dicha expectativa de privacidad está presente en el caso de autos, debemos examinar algunos casos normativos que discuten la doctrina sobre el registro posterior a una entrega controlada (*search following controlled delivery*).

En el caso *United States v. DeBerry*, 487 F.2d 448 (2do Cir. 1973), un supervisor de *Emery Air Freight Service* en Los Ángeles encontró quince (15) paquetes de marihuana en el interior de una maleta que iba a ser enviada a Nueva York. La compañía avisó inmediatamente a la Policía de Los Ángeles, quienes inspeccionaron el contenido de la referida maleta y notificaron a los agentes federales de la División de Drogas de Nueva York. Se les describió a estos agentes las medidas y el color de la maleta, el número de recibo de descarga y el número de vuelo en el que llegaría

a Nueva York. El equipaje fue mantenido bajo vigilancia hasta el momento en que llegó a su destino. Una vez allí, el apelante DeBerry presentó el recibo de descarga (*receipt of lading*) y, mientras un supervisor sacaba copia a dicho recibo, tomó la maleta y salió del terminal hacia un automóvil estacionado cerca de allí. DeBerry fue arrestado por un oficial de la Autoridad de los Puertos, efectuándose posteriormente un registro del automóvil y ocupándose la referida maleta. La Corte Federal de Apelaciones para el Segundo Circuito expresó:

> We have previously held that *an inspection by a carrier is not a governmental search. United States v. Cangiano*, 464 F.2d 320 (2d Cir. 1972). Here, making the case even stronger than Cangiano, Emery Air Freight conducted the search independently of any information or request received from government officials. We therefore accept the Government's proposition that *the search conducted in Los Angeles did not infringe upon appellants' fourth amendment rights* ....
>
> It may be argued that the New York seizure was separate and distinct from the California search, and because there was ample opportunity for the New York officers to obtain a warrant for the suitcase's seizure, its warrantless seizure violated the fourth amendment. (Citas omitidas). This, however, would ignore the facts and realities of the situation. The suitcase was seized initially in California by Sergeant Figelsky of the Los Angeles Police Department. *That seizure although done without warrant was legal, because Emery's legal inspection in effect put the marijuana in Figelsky's plain view; he, therefore, could seize the contraband upon sight.* (Citas omitidas). Figelsky made the seizure by removing one of the bricks of marijuana, marking all the rest of the bricks with his initials, and finally marking the suitcase itself with his initials. He then authorized the suitcase to be shipped on. Even though the suitcase was then in transit, later in the luggage bin, and later still in the freight room, it remained legally "seized" just as much as if it were under the actual physical control of the police. ... Thus, when the agents and police in New York removed the bag from the back seat of the car appellants were in, they were not making an initial seizure, but rather were merely reasserting control of the suitcase which had already been seized for legal purposes and which was merely being used as

bait. (Énfasis en el original suprimido y énfasis suplido.) *United States v. DeBerry*, supra, págs. 450–451.

De acuerdo con las expresiones de la Corte Federal de Apelaciones para el Segundo Circuito, hubo dos (2) intervenciones del Estado con la evidencia ocupada. La primera intervención tuvo lugar cuando uno de los agentes de la Policía de Los Ángeles removió uno de los paquetes de marihuana de la maleta, marcando con sus iniciales los paquetes restantes y autorizando su envío a la ciudad de Nueva York. La Corte fundamentó la legalidad de esta primera intervención estatal con la evidencia ocupada en el hecho de que la inspección realizada por *Emery Air Freight Service no constituyó un registro protegido por la Cuarta Enmienda de la Constitución norteamericana, ya que se trata de una persona privada cumpliendo con un propósito legítimo de la compañía para la cual se desempeña.* Este registro llevado a cabo legalmente por la compañía de servicio aéreo colocó la marihuana encontrada a plena vista de los agentes policíacos de California. Por lo tanto, la ocupación de dicha evidencia por tales agentes, aunque sin orden, constituyó una actuación legítima por parte de éstos. La segunda intervención del Estado tuvo lugar en el momento en que los agentes federales registraron el vehículo del apelante y ocuparon la referida maleta en el terminal aéreo de Nueva York. La legalidad de esta segunda intervención fue sostenida por el hecho de que durante su transportación y llegada a Nueva York, los agentes no perdieron en ningún momento el control adquirido en California sobre la maleta del apelante. Al ocuparla en su vehículo, los agentes "reafirmaron" el control que tenían sobre dicha evidencia, por lo que no había necesidad de obtener, esta vez, una orden de allanamiento.

El caso posterior de la Corte Suprema de Alaska, *McConnell v. State*, 595 P.2d 147 (Alaska 1979), es sumamente ilustrativo. En este caso, una persona envió dos (2)

cajas a uno de los terminales aéreos del Aeropuerto Internacional de Los Ángeles para que fueran enviadas a Anchorage, Alaska, a un individuo llamado Gary McConnell. Un empleado de la compañía de servicio aéreo descubrió en el interior de las cajas lo que parecía ser marihuana. El empleado llamó inmediatamente a la subestación de policía de ese aeropuerto y les informó su hallazgo. Un oficial de narcóticos (*Narcotics Task Force*) ocupó las dos (2) cajas y las trasladó al Departamento de Policía de Los Ángeles. Allí, su contenido fue fotografiado y se le practicó una prueba de campo. Dos (2) de los paquetes de marihuana fueron sacados de una de las cajas y los restantes fueron devueltos a la misma, sellándose nuevamente. Los paquetes fueron enviados a Anchorage, Alaska. Allí, un oficial telefoneó a Gary McConnell informándole que sus paquetes habían llegado. El apelante fue a buscar las cajas y, cuando se disponía a salir en su vehículo, un oficial lo detuvo. Las cajas fueron ocupadas por los oficiales.

En apelación ante el Tribunal Supremo de Alaska, McConnell planteó que

(1) el empleado de la compañía de servicio aéreo que abrió las cajas por primera vez estaba actuando como agente del Estado, por lo que violó su protección constitucional contra registros y embargos bajo la Cuarta Enmienda, y

(2) los oficiales que lo detuvieron en su vehículo y ocuparon las cajas violaron su protección constitucional bajo la Cuarta Enmienda porque no obtuvieron orden de allanamiento.

Sobre el primer planteamiento, la Corte Suprema de Alaska expresó:

> In several prior decisions, we have upheld inspections conducted by airline employees because we found that the searches were conducted by private citizens acting for legitimate, employment-related purposes. The general principle of law go-

verning this area was most recently announced in *Snyder v. State*, 585 P.2d 229 (Alaska 1978), where we stated that:

"[S]earches by airline employees, acting for an independent and legitimate airline purpose and not in conjunction with or at the direction of the police, do not violate constitutional prohibitions against unreasonable search and seizure."

.    .    .    .    .    .    .

...We hold that when Powledge opened the boxes to verify the contents, he was acting to fulfill a legitimate airline purpose and not in conjunction with or at the direction of the police. *McConnell v. State*, supra, págs. 151–152.

Sobre el segundo planteamiento hecho por el apelante en el caso de McConnell, el Tribunal Supremo de Alaska siguió la doctrina establecida en el caso *United States v. DeBerry*, supra, limitando, sin embargo, su aplicación a ciertas circunstancias específicas. Sobre este particular, expresó:

The reasoning in *DeBerry* mandates that its application be limited to the following narrow set of circumstances. *First*, contraband must be placed in transit from one person to another. *Second, the contraband must be initially discovered through lawful means*, such as a search by a private person. *Third*, law enforcement officials must come into lawfull possession of the contraband. *Seizure of contraband after it is observed in plain view is one method of acquiring lawful possession. Fourth*, authorities in possession must forward the parcel to authorities at the intended destination under controlled circumstances. Thus, the receiving authorities must have information enabling them to identify the parcel when it arrives, such as a description of the container and its contents. *Fifth*, the parcel must be under security or under reasonably continuous surveillance by authorities once it arrives at its destination. The reasonably continuous surveillance must continue after the consignee claims the container. Finally, any substantial break in the chain of custody will vitiate the lawfulness of the search. (Énfasis suplido y en el original.) *McConnell v. State*, supra, págs. 154–155.

En 1983, la Corte Suprema de Estados Unidos decidió el caso *Illinois v. Andreas*, 463 U.S. 765 (1983). A pesar de que los fundamentos de la Corte Suprema se apartan un

poco de los discutidos anteriormente, se llega al mismo resultado: la validez del registro y la ocupación de la evidencia. En este caso se envió desde Calcuta un envase de metal al apelante, quien residía en Chicago. Cuando el envase llegó al aeropuerto internacional de dicha ciudad, un inspector de Aduana federal lo abrió y encontró lo que parecía ser marihuana en su interior. De inmediato, el agente de Aduana informó su hallazgo a la *Drug Enforcement Administration*, de donde enviaron un agente especial. Dicho agente realizó una prueba química a la evidencia, confirmó que se trataba de marihuana y procedió luego a resellar el referido paquete. Al otro día, el agente enviado por la agencia se hizo pasar por mensajero y, junto a un inspector de la Policía, llevó el paquete al apartamento del apelante. Minutos después se dirigió a obtener una orden de allanamiento, mientras el inspector mantenía vigilancia en el lugar. Al percatarse el inspector de que el apelante se disponía a abandonar su apartamento con el paquete que le fuera entregado, procedió a arrestarlo y a ocupar la evidencia sin haberse obtenido aún la orden. El apelante argumentó ante la Corte Suprema de Estados Unidos que debió obtenerse una orden con el fin de abrir el paquete una vez entregado. Al respecto, la Corte Suprema expresó:

> The Fourth Amendment protects legitimate expectations of privacy rather than simply places. *If the inspection by police does not intrude upon a legitimate expectation of privacy, there is no "search" subject to the Warrant Clause.* The threshold question, then, is *whether an individual has a legitimate expectation of privacy in the contents of a previously lawfully searched container.* It is obvious that the privacy interest in the contents of a container diminishes with respect to a container that law enforcement authorities have already lawfully opened and found to contain illicit drugs. *No protected privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal.* The simple act of resealing the container to enable the police to make a controlled delivery does not operate to

revive or restore the lawfully invaded privacy rights. (Énfasis suplido y citas omitidas.) *Illinois v. Andreas*, supra, pág. 771.

Un análisis integrado de la jurisprudencia citada nos lleva a concluir que el agente Alvarado no tenía la obli-, gación de obtener una orden de allanamiento antes de abrir el paquete que recibió de la agente de Aduana. Aunque los citados casos, *U.S. v. DeBerry* y *McConnell v. State* resultan ser ilustrativos con relación a la situación fáctica ante nos en el sentido de que en ambos casos el primer agente del Estado que intervino con la evidencia ocupada lo hizo de forma legal, por cuanto en ese momento la evidencia ocupada ya carecía de la protección constitucional que se invoca en este caso, los mismos se distinguen del presente por el hecho de que la persona que realizó el registro inicial de los paquetes en tales casos fue una persona privada y no un agente del Estado. No obstante, el análisis llevado a cabo por el Tribunal Supremo norteamericano en *Illinois v. Andreas*, supra, es enteramente aplicable a la presente controversia. La validez del registro llevado a cabo por el Inspector de Aduana Hobach, en virtud de su facultad en ley para registrar equipaje o paquetes provenientes del exterior de la frontera de Estados Unidos (*border searches*),[3] derrotó la expectativa de privacidad protegida por la Cuarta Enmienda de la Constitución norteamericana y por el ya citado Art. II, Sec. 10 de nuestra Constitución.

El peticionario debió haber sido consciente de la práctica rutinaria de los agentes de la Aduana federal de registrar los paquetes que provienen del exterior. La ocu-

---

[3] En cuanto a la facultad de los agentes de Aduana para llevar a cabo registros al correo que viene del exterior, véase *United States v. Ramsey*, 431 U.S. 606, 616 (1977), donde se expresó:

"That searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border, should, by now, require no extended demonstration."

pación y el examen del contenido del paquete por el agente Alvarado después que el mismo le fuera entregado por los agentes de Aduana no constituyó un allanamiento dentro de la protección de la cláusula constitucional, por lo que no tenía que obtener previamente una orden judicial. Véanse, además: *United States v. Jacobsen*, 466 U.S. 109 (1984); W.R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* , 2da ed., Minnesota, Ed. West Publishing Co., 1987, Vol. 2, Sec. 5.5(e); E.L. Chiesa, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Sec. 6.14(D).

## III

■ Pasemos a evaluar la suficiencia de la orden de allanamiento. El peticionario sostiene en su escrito que "el magistrado que ordenó el allanamiento limitó el diligenciamiento a la Funeraria, ya que a pesar que en la declaración que dio base al allanamiento se menciona que la estructura tenía dos niveles no hizo señalamiento a esto y sí a la Funeraria". Petición de *certiorari*, pág. 10. Fundándose en tal contención, el peticionario plantea que no hubo una orden de allanamiento contra la residencia y sí contra la funeraria, y que, por lo tanto, el Ministerio Público tiene el peso de la prueba a fin de establecer bajo qué excepción se registró la residencia. El peticionario no tiene razón. Veamos por qué.

En primer lugar, el allanamiento y registro realizados en el presente caso fueron llevados a cabo en virtud de una orden judicial. Opera, por lo tanto, la presunción de legalidad respecto al allanamiento y al registro de la estructura. *Pueblo v. Vázquez Méndez*, 117 D.P.R. 170 (1986).

■ En segundo lugar, una situación particular tuvo lugar en el presente caso por razón de que el lugar a allanarse resultó ser una estructura utilizada para dos (2) fi-

nes distintos. Como hemos dicho, el primer piso está destinado al uso comercial y el segundo resultó ser la residencia del peticionario. Es de primordial importancia destacar el principio fundamental de que en una orden de allanamiento deben describirse "con particularidad la persona y el lugar a ser registrado y las cosas o propiedad a ocuparse". Regla 231 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. La ausencia de una descripción específica de la estructura a ser allanada es un defecto que con toda probabilidad invalida la orden de allanamiento y lleva ineludiblemente a la supresión de la evidencia obtenida. En este contexto, se han presentado situaciones en la jurisdicción federal que pueden calificarse como análogas a las del presente caso, en las que agentes del orden público han practicado allanamientos con orden en lo que se conoce como "estructuras de ocupación múltiple" (*multiple-occupancy structures*). En tales situaciones, la doctrina es clara al establecer que una orden de allanamiento será insuficiente —de su faz— si sólo describe de forma general la totalidad de la estructura de ocupación múltiple sin hacer referencia específica a la unidad a la cual pretenden ganar acceso los agentes del orden público. No obstante, se ha reconocido una excepción a dicha regla general. A tales efectos, LaFave señala:

> Some courts have recognized a significant exception to the above rule: if the building in question from its outward appearance would be taken to be a single-occupancy structure and neither the affiant nor other investigating officers nor the executing officers knew or had reason to know of the structure's actual multiple-occupancy character until execution of the warrant was under way, then the warrant is not defective for failure to specify a subunit within the named building. LaFave, *op. cit.*, Sec. 4.5(b).

El caso normativo respecto a la mencionada doctrina es *U.S. v. Santore*, 487 F.2d 448, de la Corte Federal de Apelaciones para el Segundo Circuito. En este caso, agentes

federales allanaron el apartamento de uno de los apelantes y ocuparon narcóticos y equipo para procesarlos. El apelante señaló esta Corte que la evidencia ocupada debía ser suprimida, ya que la residencia allanada era ocupada por dos (2) familias, una en el primer piso y otra en el segundo. Por esa razón, sostuvo que la orden no describía el lugar a allanarse con la particularidad requerida por la Cuarta Enmienda de la Constitución norteamericana. Sobre tal planteamiento, la Corte Federal de Apelaciones para el Segundo Circuito expresó:

> The house at 164 Hill Street *is to all outward appearances a one-family house* with a front door and a side door, and it had always been registered with the local authorities as one-family dwelling. A few years prior to the search the interior of the house was renovated and subdivided by Orlando, but, in contravention of local ordinances, no permission to do so was obtained from the proper authorities. Consequently, no notice of this subdivision was ever given to the local officials.
>
> In view of these facts we think that the issued warrant described the premises to be searched with that practical accuracy we have held to be necessary. ... The description in the warrant was in accordance with the outward appearance of the structure ... and in view of the concealment by Orlando of the interior alteration made by him it would be absurd to say that the Government was on notice as to it. *The agents were not warned of a possible dual occupancy of the house until after they had shown the copy of the warrant to Orlando and had entered inside. At that moment it was too late for them, consistent with the success of their mission, to have retreated and obtained a new warrant.* (Énfasis suplido.)

■ Conforme la mencionada excepción, (1) si los agentes del orden público no conocían que la estructura era de ocupación múltiple, (2) no hubieran podido descubrirlo mediante una investigación razonable antes del allanamiento y (3) llevaron a cabo tal hallazgo en el momento de diligenciarse la orden, la misma será completamente válida y suficiente en Derecho. LaFave, *op. cit.*

En el presente caso la protección constitucional que cobija la privacidad del hogar de un individuo se ve aún me-

nos afectada ya que no se trata de múltiples residentes en una estructura, sino de un solo ocupante de un edificio destinado a dos (2) usos distintos. Los autos del presente caso no reflejan razón alguna para que en la orden se limitara el registro a la primera planta, ya que *no había indicio exterior alguno de que sólo el primer piso de la estructura estuviera destinado al negocio de funeraria.* Véase *Pueblo v. Tribunal Superior*, 97 D.P.R. 517 (1969). Los agentes se percataron de que el segundo piso era la residencia del peticionario, una vez entraron a la misma. Resulta irrazonable exigir a los oficiales que en el momento en que se percatan de dicha circunstancia abandonen el lugar con el propósito de obtener otra orden de registro y allanamiento del segundo piso de la estructura. Tal exigencia hubiera puesto en riesgo los propósitos de la primera orden, ya que es razonable suponer que al abandonar los agentes el edifico, el recurrente hubiera destruido y desaparecido la evidencia. A la luz de los hechos y las circunstancias del presente caso, la orden de allanamiento expedida fue suficiente en derecho y confirió válidamente autoridad a los agentes del orden público para registrar la totalidad del edificio.

Una vez determinada la validez de la incautación hecha por los agentes de la evidencia cuya supresión se solicita, es innecesario entrar a considerar la doctrina del registro consentido a la cual apela el Procurador en su alegato. Dicha doctrina es aplicable como excepción en situaciones donde se ha realizado un registro y allanamiento sin orden judicial previa. *Pueblo v. Narváez* Cruz, 121 D.P.R. 429 (1988).(4)

---

(4) El ilustrado juez de instancia, al expresar el fundamento de su resolución, dictada en corte abierta, expuso el razonamiento siguiente:

"El tribunal no tiene dudas de que la policía deseaba entrar a la estructura completa, ni de que el Juez haya autorizado allanar dicha estructura completa. Aquí lo que existe es una situación donde el acusado combina el uso del edifico con su

La evidencia en el caso de autos fue legalmente ocupada, por lo que *se expide el auto solicitado, se dicta sentencia que confirme la resolución recurrida y se devuelve el caso para la continuación de los procedimientos ante el tribunal de instancia.*

La Juez Asociada Señora Naveira de Rodón emitió una opinión concurrente, a la cual se unió el Juez Asociado Señor Rebollo López.

— O —

Opinión concurrente emitida por la Juez Asociada Señora Naveira de Rodón, a la cual se une el Juez Asociado Señor Rebollo López.

Por las razones que más adelante expondremos, concurrimos con el resultado a que llega hoy la mayoría de este Tribunal.

En el caso de autos, el Tribunal Superior declaró sin lugar una moción de supresión de evidencia, conforme a la Regla 234 de Procedimiento Criminal, 34 L.P.R.A. Ap. II, presentada por el acusado, aquí peticionario, José E. Pérez Narváez.

Entre otros señalamientos, el peticionario cuestionó la suficiencia de la orden de allanamiento y solicitó que se suprimiese la evidencia incautada en su hogar. En el escrito ante nos expresa que el diligenciamiento de la orden en su residencia fue ilegal, ya que el mandamiento fue expedido contra la funeraria *Century Funeral Home* (Funeraria) y no contra la residencia en sí.

---

residencia, pero el paquete iba dirigido a una dirección específica y era la de dicha estructura."

Es significativo que nada expresó el juez respecto al supuesto consentimiento del acusado para que los agentes registraran aquella parte del edificio que constituía su residencia. La ausencia de indicio alguno al efecto de que el Juez de instancia haya denegado la supresión de la evidencia fundado en la versión del agente Guzmán Muller sobre este particular, refuerza nuestro convencimiento de no entrar a considerar este aspecto del caso por resultar superfluo.

De la orden del Tribunal de Distrito surge que sólo se hizo referencia a la Funeraria.([1]) Se expresó, además, que se expedía "una Orden de Allanamiento para dicho local ...". Bajo la sección titulada "Colindancias y Estructuras", se consignó lo siguiente: "Estructura de dos niveles ... En la entrada tiene terraza constru[i]da en madera, al frente tiene letras que leen Century color negras." En ningún momento se aludió a la residencia en el texto de la orden, puesto que es durante su diligenciamiento que los agentes de la División de Drogas se percatan que en el segundo piso de la estructura estaba ubicada la residencia del peticionario.

En el caso de autos existe la situación particular de que el acusado combina el uso comercial del edificio objeto del mandamiento judicial con otro uso que conlleva mayor protección frente al Estado: el edificio también le servía de residencia. Los dos agentes de la División de Drogas testificaron en la vista preliminar que toda la evidencia incautada se encontró en la residencia. En cuanto a la separación de la residencia con respecto a la Funeraria, el agente Julio Alvarado, supervisor de los agentes que participaron en el allanamiento, declaró que al momento del diligenciamiento estaban cerradas las dos entradas que tiene la residencia, una mediante una puerta y la otra por medio de un portón de rejas.([2]) Su testimonio coincidió con el del agente Rafael Guzmán Muller, el policía que participó en el operativo y quien entregó al acusado el paquete con picadura de marihuana enviado a través de Federal Express. Ambos afirmaron que desde ningún punto de la Funeraria se puede observar el interior de la residencia, así como

---

([1]) El paquete —que contenía alrededor de dos libras de marihuana— iba dirigido a *Century Funeral Home*, Calle Loíza #259, Santurce.

([2]) Se presentaron en evidencia dos fotografías con respecto a esto.

también que para entrar a la Funeraria no hay que entrar a la residencia.(³)

El agente Alvarado atestó que hay dos escaleras para subir a la segunda planta, las cuales se originan en un área anexa al interior de la Funeraria. Ambos agentes de la División de Drogas, así como el embalsamador de la Funeraria, declararon que en el segundo piso estaba ubicada la floristería de la Funeraria, por lo cual nada impedía a los visitantes subir al segundo nivel para seleccionar las coronas de flores.(⁴) Sin embargo, el embalsamador aclaró que los empleados de la Funeraria no podían subir a la residencia, a menos que pidiesen permiso, y que ambas entradas de la residencia siempre se mantenían cerradas.

Si los agentes lo que observan a simple vista es una estructura comercial, y la orden de allanamiento a efectuarse en la estructura así como la declaración jurada en la cual está basada la orden únicamente mencionan el local comercial, ¿se puede entender que esta orden se extiende también a una residencia que esté ubicada dentro de la estructura, aún sin estar esto especificado en el mandamiento judicial? Entendemos que no. Resolver de otro modo sería concederle discreción a los agentes para allanar lugares que no están descritos específicamente en la orden. El problema se agudiza, aún más, si como ocurre en este caso, se trata de la residencia, el hogar del acusado, un lugar donde la expectativa razonable a la intimidad es aún mayor. Véase E.L. Chiesa Aponte, *Derecho procesal penal de Puerto Rico y Estados Unidos*, Colombia, Ed. Forum, 1991, Vol. I, Secs. 6.10A(4), 6.13C y 6.14C. Después de todo, "[l]a orden de allanamiento se libra para registrar

---

(³) En la vista de supresión de evidencia fue admitido en evidencia el permiso de uso —vencido— expedido por la Administración de Reglamentos y Permisos (A.R.Pe.) de cuyo contenido se desprende que sólo la planta baja de las dos plantas era destinada a la Funeraria.

(⁴) El agente Guzmán admitió que la floristería fue lo último que observó luego de haber registrado toda la residencia. Véase Petición de *certiorari*, pág. 5.

una propiedad y va dirigida contra la cosa a manera de un procedimiento *in rem*". (Énfasis en el original.) O.E. Resumil de Sanfilippo, *Derecho Procesal Penal*, Orford, Equity Publishing Co., 1990, T.1, Sec. 11.12, pág. 293; *Pueblo v. Pieras*, 72 D.P.R. 779, 783 (1951).

I

*La orden de allanamiento a la residencia*

En *Pueblo v. Bonilla*, 78 D.P.R. 152, 156 (1955), manifestamos que

> ... una orden de allanamiento, para ser válida, debe describir el lugar o los lugares a ser allanados con suficiente certeza de suerte que nada quede a la discreción del funcionario que la diligencia con respecto a qué lugar o qué lugares se le ordena que allane.

En este caso, tanto la orden de allanamiento como la declaración jurada en que se fundaba especificaban que la residencia del apelante estaba ubicada en una casa dividida en tres apartamentos, dos de los cuales eran comerciales y el del centro correspondía a la vivienda a ser allanada.

Un ciudadano no renuncia a su derecho a que su residencia no sea allanada sin mediar orden judicial específica, bajo la premisa equivocada de que su vivienda está ubicada en una estructura que comparte con un local comercial contra el cual se expidió una orden judicial. Debido a la necesidad de vivienda imperante en nuestro país, particularmente en las zonas urbanas, abundan las estructuras que albergan un local con fines comerciales en la planta baja, pero que sirve como vivienda en la planta alta o en un área interior del edificio. Permitir que el allanamiento se extienda a toda la estructura, sin que se haya especificado que la orden también aplica a la residencia que existe separada del negocio, puede propiciar arbitrariedades por

parte de los agentes que realizan el diligenciamiento, situación que siempre ha querido evitar este Alto Foro. Véanse: *Pueblo v. Cruz Martínez*, 92 D.P.R. 747, 749 (1965); Chiesa Aponte, *op. cit.*; Resumil de Sanfilippo, *op. cit.*

Es mandato constitucional que las órdenes judiciales que autoricen registros o allanamientos describan particularmente el lugar a registrarse o las cosas a ocuparse. Art. II, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1. Este Tribunal ha reconocido que el derecho a la intimidad es de la más alta jerarquía, por lo cual hemos expresado lo siguiente:

> El carácter y primacía del derecho y protección a lo privado nos ha movido a reconocer que opera *ex proprio vigore* …. [E]l derecho a la intimidad en nuestro país tiene un historial distinto y más amplio que el plasmado en la jurisdicción federal …. *Colón v. Romero Barceló*, 112 D.P.R. 573, 576 (1982).

La citada Sec. 10 de nuestra Constitución ofrece protección contra invasiones a la santidad del hogar y a la intimidad de la vida. *Pueblo v. Vargas Delgado*, 105 D.P.R. 335, 337–338 (1976); Chiesa Aponte, *op. cit.*

Debido a que la residencia del acusado era un lugar separado del local comercial de la Funeraria; que las dos puertas de la residencia se mantenían cerradas, y que ni siquiera los empleados de la Funeraria podían entrar sin permiso, es necesario concluir que el acusado tenía una expectativa razonable de intimidad en su residencia, aunque estuviese ubicada en la misma estructura que albergaba la Funeraria. Véanse: *Pueblo v. Luzón*, 113 D.P.R. 315, 326 (1982); *Pueblo v. Turner Goodman*, 110 D.P.R. 734, 738 (1981); *Pueblo v. Lebrón*, 108 D.P.R. 324, 332 (1979); *Katz v. United States*, 389 U.S. 347 (1967); Chiesa Aponte, *op. cit.*; Resumil de Sanfilippo, *op. cit.* Tampoco estamos ante circunstancias excepcionales que obligaran a los agentes a entrar a la residencia sin orden, como ocurre en los casos de allanamiento sin orden como parte de la

persecución de un sospechoso o *hot pursuit*. Véase Resumil de Sanfilippo, *op. cit.*, Sec. 9.23, págs. 250–253.

*Legalidad del allanamiento en el caso de autos*

El registro de la residencia del acusado en el caso de autos se efectuó con una orden que no iba dirigida a ésta. La orden no describía con particularidad el lugar a ser allanado, es decir, la residencia. Así, pues, estaba viciada de nulidad en cuanto a la vivienda, ya que le permitía al diligenciante usar la discreción en cuanto al lugar a allanarse. *Pueblo v. Cruz Martínez*, supra, pág. 749. Bajo estas circunstancias, no le ampara al registro la presunción de validez y el Ministerio Público tiene el peso de la prueba para establecer bajo qué excepción se registró el hogar del peticionario. Véase *Pueblo v. Lebrón*, supra, pág. 329.

Sin embargo, la prueba testifical del Pueblo fue a los efectos de que el peticionario le expresó al agente Guzmán Muller, en el momento en que éste le entregó copia de la orden, lo siguiente: "Sube que lo que tú vienes a buscar está arriba." Las manifestaciones del testigo de cargo no fueron contradichas por la defensa, por el contrario, éstas se citan en los propios escritos del peticionario.[5] Mediante estas expresiones dirigidas al agente Guzmán Muller, el acusado peticionario Pérez Narváez consintió voluntariamente al registro de su residencia sin que mediase una orden. Aún más, el acusado presenció cuando el policía Guzmán dio inicio al registro en el segundo nivel y no hizo objeción alguna. Dicho agente tuvo que registrar cada una de las tres habitaciones de la vivienda antes de ocupar el paquete que contenía marihuana enviado a través de Federal Express. También se ocupó otro material ilegal: cocaína, marihuana y dinero en efectivo.

---

[5] Véase Petición de *certiorari*, pág. 4.

Aquí medió, pues, el consentimiento del titular del derecho a la intimidad. El peticionario válidamente renunció a la protección constitucional y, mediante su consentimiento expreso, legitimó el allanamiento. *Pueblo v. Acevedo Escobar*, 112 D.P.R. 770, 777 (1982).

Por lo antes expuesto, concurrimos con la opinión de la mayoría en que no procede que se suprima la evidencia incautada por los agentes en la residencia del acusado. La resolución del foro de instancia debe confirmarse.